## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIELLE M. MITCHELL, )
)
     Plaintiff, )
)
v. )    **CIVIL ACTION NO. 10-129J**
)    **JUDGE KIM R. GIBSON**
JEFFREY T. MILLER, LINDA )
BONNEY, RODNEY MANNING, )
MARK W. GREENER, KENNETH A. )
KARAS, JASON URBANI, WILLIAM )
POTTER, and the PENNSYLVANIA )
STATE POLICE, )
)
     Defendants. )

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on a motion for summary judgment filed by the Defendants pursuant to Federal Rule of Civil Procedure 56. ECF No. 31. For the reasons that follow, that motion will be granted in part and denied in part.

### II. BACKGROUND

Plaintiff Danielle M. Mitchell ("Mitchell") enlisted in the 120th cadet class of the Pennsylvania State Police ("PSP") on October 17, 2005.[1] ECF No. 32-4 at 2. She suffered a stress fracture in her right hip shortly thereafter. ECF Nos. 33 & 40 at ¶ 6. Dr. Darby Hand, a physician employed by the Commonwealth of Pennsylvania's Bureau of Personnel, examined Mitchell on October 20, 2005. ECF No. 40-4 at 3. In a letter dated October 21, 2005, Dr. Hand stated that there was "no reasonable way" that Mitchell could train to be a police officer with a

---

[1] At the time of her initial enlistment, Mitchell's last name was Flenner. ECF No. 32-4 at 2. She apparently changed her last name after getting married. *Id.*

fractured hip. *Id.* It was recommended that Mitchell return home and seek treatment from an orthopedic surgeon. *Id.* She conditionally resigned from the PSP that same day. *Id.* at 12. The terms of Mitchell's resignation provided that she could be reinstated after receiving medical clearance to engage in the physical activities required of a PSP cadet. ECF No. 32-3 at 26-27.

Mitchell enlisted in the PSP's 124th cadet class on January 22, 2007. ECF No. 32-4 at 2. On February 1, 2007, she began to experience severe pain in her right groin and hamstring. *Id.* at 9. It was determined that she had torn a muscle located near her right groin. ECF No. 32-9 at 6. Mitchell conditionally resigned from the PSP on February 12, 2007, with the understanding that she could be reinstated after being cleared for duty. ECF No. 32-3 at 28-29.

The PSP's 125th cadet class began its training on June 11, 2007. ECF Nos. 33 & 40 at ¶ 1. The class was comprised of sixty cadets, one of whom was Mitchell. *Id.* at ¶¶ 1-2. The anticipated graduation date for members of the class was December 21, 2007. *Id.* at ¶ 2. Most of the training activities engaged in by members of the class were conducted at the PSP's Southwest Training Center ("Center") in Greensburg, Pennsylvania. *Id.* at ¶ 4. The remaining activities were held at the PSP's Academy in Hershey, Pennsylvania. *Id.* William Potter ("Potter") and Jason Urbani ("Urbani") were instructors at the Center. *Id.* at ¶ 5. Mark W. Greener ("Greener") was the physical training instructor at the Academy. *Id.*

Cadets training at the Center or the Academy are required to adhere to the rules and regulations contained in the "Cadet Handbook." *Id.* at ¶ 30. Any cadet guilty of wrongdoing is required to acknowledge his or her misconduct in a letter to the appropriate staff member within twenty-four hours of being ordered to do so. ECF No. 32-7 at 29-30. The stated purpose of such a letter is "to deter the [c]adet from behaving in an undesirable manner." *Id.* at 34. Under the PSP's disciplinary system, *de minimis* infractions result in only the documentation of

2

"wrongdoing or unacceptable behavior," while more serious infractions can lead to more drastic forms of discipline. *Id.* at 31-34. First-level infractions can result in counseling or disciplinary training, whereas second-level infractions can "result in disciplinary training, extra duty assignments, restriction, or any combination thereof." *Id.* at 31. The most serious violations of PSP rules are classified as third-level infractions, which can result in a cadet's suspension or dismissal. *Id.* at 32-34. A cadet who commits seven first-level infractions is guilty of a second-level infraction. *Id.* at 34. He or she is charged with another second-level infraction upon the commission of five more first-level infractions. *Id.* A cadet who commits three second-level infractions is guilty of a third-level infraction. *Id.* at 35. He or she is charged with a second third-level infraction upon the commission of two additional second-level infractions. *Id.* The accumulation system is more severe when a cadet repeatedly commits the same type of infraction. Where a cadet's first-level infractions are similar in nature, only five are required to constitute a second-level infraction. *Id.* 34. Similarly, a cadet who commits the same second-level infraction on two separate occasions may be charged with a third-level infraction. *Id.* at 35.

Between June 30, 2007, and December 5, 2007, Mitchell acknowledged in several letters to staff members that she had failed to adhere to the relevant rules and regulations. ECF No. 32-1 at 19-47. The misconduct allegedly engaged in by Mitchell included her failure to preface her questions to staff members with the word "Sir," her failure to report her illnesses and injuries at the time of formation, her failure to obey specific firearms-related instructions, her failure to properly wear her "uniform tie," her failure to polish her "campaign hat strap," her failure to report to class in "full Trooper uniform," her failure to ask questions in accordance with the proper chain of command, her untruthfulness about the number of push-ups that she had completed, and her unauthorized conversation with another cadet during the course of a

3

swimming exercise. *Id.* In a desk memorandum dated October 29, 2007, Lieutenant Michael Selgrath ("Selgrath") informed Corporal Gerald L. Hocker, Jr. ("Hocker"), that he was requesting an Academy Disciplinary Officers' ("ADO") inquiry into Mitchell's "suitability for employment as a Trooper." ECF No. 32-2 at 7. Hocker was serving as an Assistant ADO at that time. *Id.* at 2. The memorandum stated that Mitchell's performance had been unsatisfactory, and that she had been made aware of the request for an ADO inquiry on October 26, 2007. *Id.*

On November 20, 2007, it was determined that Mitchell's multiple first-level infractions had rendered her guilty of a second-level infraction. *Id.* at 18. She was assigned extra duties and ordered to remain at the training facility during an off-duty weekend. *Id.* Mitchell was informed on December 3, 2007, that additional first-level infractions had caused her to be charged with another second-level infraction. *Id.* at 17. She was given additional duties and instructed to remain at the training facility "pending the outcome of a disciplinary review." *Id.*

Cadets preparing to serve as officers for the PSP are generally required to pass four physical fitness tests. *Id.* at ¶ 15. Mitchell passed the first two physical fitness tests, which were conducted in June 2007 and August 2007. *Id.* at ¶ 16. A medical restriction precluded her from undergoing the third test, which was conducted on October 29, 2007. *Id.* On December 18, 2007, Mitchell failed the fourth and final physical fitness test. ECF No. 32-2 at 64.

Captain Rodney A. Manning ("Manning") was the Director of the PSP's Training Division in December 2007. ECF Nos. 33 & 40 at ¶ 41. In a memorandum to Manning dated December 19, 2007, Hocker recommended that Mitchell be immediately dismissed from her employment with the PSP. ECF No. 32-1 at 2-15. The recommendation was based on a finding by Hocker and Assistant ADO William F. Summers ("Summers") that Mitchell's commission of the same second-level infraction on two separate occasions had rendered her guilty of a third-

4

level infraction. *Id.* at 11-15. Hocker further stated that Mitchell's repeated infractions had constituted *prima facie* evidence of "incompetence." *Id.* at 14-15.

Selgrath advised Mitchell that she would not be graduating with the other members of the 125th cadet class. ECF Nos. 33 & 40 at ¶ 49. On December 20, 2007, Manning informed Mitchell that Hocker had recommended her dismissal and provided her with an opportunity to refute the allegations against her. *Id.* at ¶ 50; ECF No. 32-3 at 9. In a memorandum to Manning dated December 21, 2007, Mitchell stated that she had been "punished" and "discriminated" against since her initial injury. ECF No. 32-3 at 10. She accused Potter of telling her that she would never become a "committed and confident" member of the PSP and faulted Urbani for denying her requests for additional training. *Id.* She explained that her injuries had prevented her from successfully completing some of her "morning runs." *Id.* at 11. Mitchell described an incident in which Potter had refused to permit her to remove her mask while she was in the process of vomiting, causing her to risk suffocation. *Id.* at 11-12. She asserted that Greener had warned her that she would never make it through her "probationary period" even if she were fortunate enough to graduate. *Id.* at 12. Mitchell concluded her memorandum by expressing her continued desire to serve as a member of the PSP. *Id.* at 13.

After receiving Mitchell's memorandum, Manning completed an internal complaint worksheet and turned the matter over to the PSP's Internal Affairs Division ("IAD"). ECF Nos. 33 & 40 at ¶ 52. Thirty-eight members of the 125th cadet class graduated on December 21, 2007. *Id.* at ¶ 3. Among the thirty-eight graduates were thirty-six males and two females. *Id.*

On January 3, 2008, Manning recommended that Mitchell's employment with the PSP be terminated. ECF No. 32-3 at 4-8. He summarized the reasons for his recommendation in a five-page memorandum. *Id.* The memorandum was forwarded to Major Mark E. Lomax ("Lomax"),

5

who was serving as the Director of the PSP's Bureau of Training and Education. Lomax expressed his agreement with Manning's recommendation in a memorandum to Commissioner Jeffrey T. Miller ("Miller") dated January 7, 2008. *Id.* at 3.

The investigation resulting from Mitchell's memorandum of December 21, 2007, was conducted by Sergeant Kenneth A. Karas ("Karas"). ECF Nos. 33 & 40 at ¶ 53. Mitchell supplemented her allegations of misconduct with a memorandum to Karas dated January 25, 2008. ECF No. 32-3 at 23-24. In her supplemental memorandum, Mitchell accused Potter of questioning the credibility of her treating physicians and forcing her to run while injured. *Id.* at 23. She further stated that many of her letters acknowledging the commission of misconduct had been unwarranted, and that other cadets had not been disciplined for similar missteps. *Id.* at 23-24. Miller chose to postpone his decision concerning Mitchell's employment status because of the investigation resulting from her allegations against other PSP officials. ECF Nos. 33 & 40 at ¶ 61. In the meantime, Mitchell was assigned to work at the PSP's Office of Procurement and Supply in Hershey. *Id.* at ¶ 92.

During the course of his investigation, Karas interviewed all thirty-eight cadets who had graduated on December 21, 2007. *Id.* at ¶ 63. He interviewed Mitchell on March 4, 2008. ECF No. 32-5 at 5-44. When questioned about her complaints of discrimination, Mitchell specifically accused Potter, Urbani and Greener of treating her differently because of her sex and medical condition. *Id.* at 5-44. Mitchell suffered a torn hamstring during the pendency of the disciplinary proceedings. ECF Nos. 33 & 40 at ¶ 95. She conditionally resigned from her position with the PSP for the third time on March 11, 2008, with the understanding that she could be reinstated after receiving medical clearance to return to work. ECF No. 32-3 at 30-31.

After reviewing the findings of Karas' investigation, Manning determined that the allegations of wrongdoing made by Mitchell had been "unfounded." ECF No. 32-7 at 5, 7. Manning summarized the reasons for his determination in a written report dated April 18, 2008. *Id.* at 2-7. Lieutenant Colonel John R. Brown ("Brown"), the PSP's Deputy Commissioner of Administration and Professional Responsibility, recommended on April 24, 2008, that Mitchell's employment relationship with the PSP be terminated. *Id.* Miller formally approved Mitchell's discharge on April 28, 2008. *Id.* at 20. Linda M. Bonney ("Bonney"), the Director of the PSP's Bureau of Human Resources, later sent Mitchell a letter informing her of Miller's decision.[2] ECF No. 24 at ¶ 19.

Mitchell later filed a verified complaint with the Pennsylvania Human Relations Commission ("PHRC") pursuant to 43 PA. STAT. § 959(a), alleging that the PSP had discriminated against her because of her sex and disability and retaliated against her for complaining about such discrimination.[3] ECF No. 32-8 at 35-40. The complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC") to exhaust the remedies available to Mitchell under Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*] and Title I of the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12111 *et seq.*]. *Id.* Mitchell commenced this action against Miller, Bonney, Manning, Greener, Karas, Selgrath, Urbani and Potter on May 18, 2010, alleging violations of the First and Fourteenth Amendments to the United States Constitution and the applicable provisions of the

---

[2] The record contains a letter from Bonney to Mitchell conveying Miller's decision to terminate Mitchell's employment with the PSP. ECF No. 32-3 at 15. That letter is dated May 18, 2008. *Id.* Mitchell alleges that the letter informing her of the discharge decision was actually dated May 29, 2008, and that she did not receive the letter until the middle of June 2008. ECF No. 24 at ¶ 19.

[3] The timing of this filing is disputed by the parties. The verified complaint contained in the record was signed by Mitchell on April 9, 2009. ECF No. 32-8 at 40. The record also contains a discharge questionnaire that Mitchell submitted to the PHRC on February 6, 2009. ECF No. 6-1 at 4-10. During her deposition, however, Mitchell testified that she had faxed a complaint to the PHRC on November 14, 2008. ECF No. 32-9 at 33.

Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*]. ECF No. 1. At that time, Mitchell's charge of discrimination was still pending before the EEOC. *Id.* at ¶ 12.

The Defendants filed a partial motion to dismiss on July 20, 2010, contending that most of Mitchell's claims were time-barred. ECF Nos. 6 & 7. The partial motion to dismiss was granted in a memorandum opinion and order dated March 23, 2011. ECF No. 19. Mitchell was granted leave to file an amended complaint. *Id.* On May 2, 2011, the EEOC provided Mitchell with written notice of her right to sue the PSP for employment discrimination and retaliation. ECF No. 24-1. Mitchell filed her amended complaint on May 16, 2011. ECF No. 24. She named the PSP as an additional defendant and added claims under Title VII and the ADA. *Id.* at ¶¶ 40-44.

Selgrath died on July 12, 2011. ECF No. 30 at ¶ 1. On October 25, 2011, the Defendants moved for his dismissal from this case pursuant to Federal Rule of Civil Procedure 25(a)(1). *Id.* at ¶ 3. They filed a motion for summary judgment on October 31, 2011. ECF No. 31. None of the parties filed a motion for substitution within the ninety-day period established by Rule 25(a)(1).[4] FED. R. CIV. P. 25(a)(1). Consequently, Selgrath was dismissed as a defendant in this action on February 17, 2012. ECF No. 46. The motion for summary judgment filed by the Defendants is the subject of this memorandum opinion.

### III. STANDARD OF REVIEW

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED.

---

[4] Federal Rule of Civil Procedure 25(a)(1) provides:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

FED. R. CIV. P. 25(a)(1). Since no motion for substitution was filed within the prescribed period of time, Rule 25(a)(1) required Selgrath's dismissal from this case. ECF No. 46.

R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial.  *Id.* at 324.  The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.  JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over Mitchell's federal claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 12117(a).  Supplemental jurisdiction

over her PHRA claims is predicated on 28 U.S.C. § 1367(a).  Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Mitchell asserts First Amendment claims against Miller, Bonney, Manning, Greener, Karas, Urbani and Potter.  ECF Nos. 24 at ¶¶ 32-35.  She alleges that these defendants effectuated her discharge in retaliation for complaints that she had lodged against Greener, Urbani and Potter.  *Id.*  Mitchell avers that Greener, Urbani and Potter violated her rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting her to adverse treatment because of her sex.  *Id.* at ¶¶ 36-38.  Her federal claims against the PSP are sex- and disability-based discrimination claims arising under Title VII and the ADA.  *Id.* at ¶¶ 39-44.  Mitchell also brings PHRA claims against the PSP and the individual defendants.  *Id.* at ¶¶ 45-48.

### A.    The Federal Constitutional Claims

Mitchell brings her federal constitutional claims pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.  This statutory provision does not create substantive rights.  *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)(observing that § 1983 "does not create substantive rights at all, but merely provides a remedy for the violation of rights conferred by the Constitution or other statutes").  A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right.

10

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119-120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

### 1.    The Equal Protection Clause Claims

The first step in the Court's analysis is to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST., AMEND. XIV, § 1.  This constitutional provision "protects each *person* within a State's jurisdiction (*i.e.*, a "class of one") from arbitrary or irrational discrimination."  *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 830-831 (W.D.Pa. 2010)(emphasis in original), citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(*per curiam*).  For this reason, a plaintiff can ordinarily pursue a claim under the Equal Protection Clause without alleging discrimination based on his or her membership in a particular class.  *Garcia v. Newtown Township*, 819 F.Supp.2d 416, 433, n. 12 (E.D.Pa. 2011).  This general rule, however, does not apply to claims arising in the context of public employment.  Because "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify," a public employee cannot establish a violation of the Equal Protection Clause merely by showing that a personnel action taken against him or her was arbitrary or irrational.  *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 604-605, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).  Instead, a public employee attempting to establish a violation of the Equal Protection Clause must demonstrate that the challenged personnel action was taken because of his or her class membership.  *Id.* at 605 (explaining that

"the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently").

Mitchell alleges that Greener, Urbani and Potter violated her rights under the Equal Protection Clause by harassing, humiliating, intimidating, demeaning and ridiculing her "because she was a woman." ECF No. 24 at ¶ 37. Discrimination perpetrated because of an individual's sex is actionable in the public employment setting. *Engquist*, 553 U.S. at 604 (remarking that "discriminatory classifications" based on sex "implicate basic equal protection concerns"); *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 726-740, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003)(recognizing that Congress' authority to enforce the provisions of the Fourteenth Amendment includes the power to remedy and deter sex-based discrimination engaged in by public employers). Greener, Urbani and Potter do not take issue with this basic principle. Instead, they argue that Mitchell's claims are barred by the applicable statute of limitations. ECF No. 34 at 14-15.

The affirmative defense raised by Greener, Urbani and Potter is grounded in 42 U.S.C. § 1988(a), which provides:

> **§ 1988. Proceedings in vindication of civil rights**
> **(a) Applicability of statutory and common law.** The jurisdiction in civil and criminal matters conferred on the district and circuit courts [district courts] by the provisions of this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a). Because there is no federal statute of limitations applicable to claims arising under § 1983, the United States Supreme Court has construed § 1988(a) to mean that such claims are subject to the statutes of limitations applicable under state law. *Board of Regents v. Tomanio*, 446 U.S. 478, 484, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980)(observing that, in actions brought under § 1983, state statutes of limitations are "binding rules of law"). The statute of limitations applicable to actions brought under § 1983 in a particular State is the statute of limitations applicable to actions brought in that State to recover damages for personal injuries. *Wilson v. Garcia*, 471 U.S. 261, 276-280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In Pennsylvania, the relevant limitations period is two years. 42 PA. CONS. STAT. § 5524(2), (7); *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985).

Mitchell's Equal Protection Clause claims against Greener, Urbani and Potter all stem from their alleged mistreatment of her during her time at the Center and the Academy. ECF No. 24 at ¶¶ 36-38. Mitchell testified that she had not seen Urbani or Potter after writing her memorandum to Manning. ECF No. 32-9 at 27. That memorandum was dated December 21, 2007, which would have been Mitchell's graduation date. ECF No. 32-3 at 10. Although Mitchell stated that she had seen Greener in Hershey subsequent to that date, she did not describe any acts of discrimination during that period of time.[5] ECF No. 32-9 at 19-20. On March 11, 2008, Mitchell conditionally resigned from her position with the PSP. ECF No. 32-3 at 30-31. Aside from proceedings conducted in connection with this action, Mitchell never interacted with Greener, Urbani or Potter again. ECF No. 32-9 at 20. This action was commenced on May 18,

---

[5] Mitchell testified that Greener had "screamed and hollered" at her on one occasion during her time at the PSP's Office of Procurement and Supply. ECF No. 32-9 at 12. The Court understands Mitchell's Equal Protection Clause claims to be based on conduct occurring while she was a member of the 125th cadet class. ECF No. 24 at ¶¶ 25-28. Even if those claims are partially based on her subsequent interactions with Greener, however, those interactions occurred prior to her conditional resignation. ECF No. 32-9 at 20. Since more than two years elapsed between Mitchell's conditional resignation and the commencement of this action, her claims under the Equal Protection Clause are time-barred in any event. 42 PA. CONS. STAT. § 5524(2), (7).

2010. ECF No. 1. Since more than two years elapsed between the discriminatory acts alleged by Mitchell and the commencement of this action, her claims under the Equal Protection Clause are barred by Pennsylvania's two-year statute of limitations.

In an attempt to overcome the statute-of-limitations defense, Mitchell argues that the actions of Greener, Urbani and Potter should be viewed as one part of a "continuing violation" of her constitutional rights that did not end until she was discharged. ECF No. 41 at 22-24. This argument is unavailing. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113-118, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a case governed by Title VII's anti-discrimination provision, the Supreme Court distinguished between "discrete discriminatory acts" that are individually actionable and acts of harassment that, while not individually actionable, may collectively subject an employer to liability under a "hostile work environment" theory. Speaking through Justice Thomas, the Supreme Court explained that since "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. The Supreme Court went on to clarify that a "hostile work environment" claim is timely whenever "an act contributing to the claim occurs within the filing period." *Id.* at 117.

In *O'Connor v. City of Newark*, 440 F.3d 125, 128-129 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit extended the standard established in *Morgan* to claims arising under § 1983. Consequently, that standard governs the timeliness of Mitchell's claims under the Equal Protection Clause. Since Mitchell's termination was a "discrete act" of alleged discrimination, it cannot be treated as merely one part of a "continuing violation" of her

constitutional rights. *Mikula v. Allegheny County*, 583 F.3d 181, 185-186 (3d Cir. 2009). The conduct engaged in by Greener, Urbani and Potter must be viewed separately. *Id.*

A public employer violates the Equal Protection Clause when it subjects a public employee to a "hostile work environment" because of his or her sex. *White v. Dept. of Correctional Services*, 814 F.Supp.2d 374, 392 (S.D.N.Y. 2011). In order for such a claim to be timely, however, "an act contributing to the claim" must occur within the applicable "filing period." *Morgan*, 536 U.S. at 117. During her deposition, Mitchell acknowledged that she had not interacted with Greener, Urbani or Potter subsequent to her conditional resignation on March 11, 2008. ECF No. 32-9 at 20, 27. More than two years elapsed between that date and the commencement of this action. Therefore, Mitchell's claims under the Equal Protection Clause are barred by the statute of limitations even if they are properly treated as "hostile work environment" claims. *Morgan*, 536 U.S. at 117-118. The Defendants' motion for summary judgment will be granted with respect to those claims. ECF No. 24 at ¶¶ 36-38.

## 2.    The First Amendment Claims

The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST., AMEND. I. Mitchell's First Amendment claims against the individual[6] defendants appear to be grounded in the Free Speech and Petition Clauses. ECF No. 24 at ¶¶ 32-35. Those provisions apply to state actors because of their incorporation within the Due Process Clause of

---

[6] The PSP is not a "person" amenable to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). For this reason, Mitchell's First Amendment claims are asserted only against the individual defendants. ECF No. 24 at ¶¶ 32-35.

15

the Fourteenth Amendment. *Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988).

It was once unchallenged dogma that the Constitution did not provide a public employee with a basis for objecting to the terms or conditions of his or her employment, even where such terms or conditions restricted the exercise of constitutional rights. *Adler v. Board of Education*, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1952)(stating that public employees had no constitutional right to work for the government "on their own terms," and that those who did not wish to conform to state-imposed conditions of employment were "at liberty to retain their beliefs and associations and go elsewhere"). More recently, however, the Supreme Court has declared that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The test used to determine whether a public employer has transgressed this proscription has its genesis in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the Supreme Court explained:

> "The theory that public employment which may be denied altogether may be subject to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents*, [385 U.S. 589, 605-606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)]. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, *as a citizen*, in commenting upon *matters of public concern* and the interest of the State, *as an employer*, in promoting the efficiency of the public services it performs through its employees.

16

*Pickering*, 391 U.S. at 568 (emphasis added).   This language in *Pickering* describes the framework that must be employed in determining whether the First Amendment prohibits a public employer from discharging or disciplining an employee in response to his or her speech.

Decisions rendered subsequent to *Pickering* illustrate that the precise language used in that decision must be taken seriously.   For expression to enjoy the particular form of constitutional protection provided under *Pickering*, it must come from a public employee who is speaking "as a citizen."  *Id.*  In *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that public employees "are not speaking as citizens for First Amendment purposes" when they "make statements pursuant to their official duties." The rule established in *Garcetti* reflects a public employer's prerogative to control "what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 422.  In *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that the Free Speech Clause does not prevent a public employer from taking disciplinary action against an employee who speaks about matters of only "personal interest."  The decision in *Connick* gives effect to the language in *Pickering* referring to a public employee's interest in "commenting upon matters of public concern." *Pickering*, 391 U.S. at 568.

Where a public employee speaks "as a citizen" about "matters of public concern" and is disciplined in retaliation for that speech, "the possibility of a First Amendment claim arises." *Garcetti*, 547 U.S. at 418.  In that situation, the legality of the disciplinary action generally turns on "whether the relevant government entity ha[s] an adequate justification for treating the employee differently from any other member of the general public," whether the employee's speech "has some potential to affect the entity's operations," and whether the concomitant restrictions on speech are necessary to the entity's efficient and effective operation.  *Id.* at 418-

419. Consideration may also be given to whether the speech "impairs discipline by superiors or harmony among co-workers," "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," "impedes the performance of the speaker's duties," or "interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Where a public employee speaks not "as a citizen," but rather pursuant to his or her official duties, "the Constitution does not insulate [his or her] communications from employer discipline." *Garcetti*, 547 U.S. at 421. Similarly, where a public employee's speech does not involve a matter of public concern, the First Amendment does not prevent his or her employer from taking disciplinary action in response to that speech. *City of San Diego v. Roe*, 543 U.S. 77, 82-83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)(explaining that "a public employee's speech must touch on a matter of 'public concern'" in order to "merit *Pickering* balancing").

The Supreme Court's decisions applying *Pickering* and its progeny recognize that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)(plurality opinion). In order to avail itself of such latitude, however, a government must truly be acting "as an employer." *Pickering*, 391 U.S. at 568. In *Connick*, the Supreme Court remarked that "an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." *Connick*, 461 U.S. at 147. This observation in *Connick* reflects the fact that statements made by a public employee pursuant to his or her official duties, or regarding matters of purely personal interest, may be characterized as

18

"unprotected" only "in the sense that *employment-related sanctions* may be imposed on the basis of such statements." *Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485, 504, n. 22, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)(emphasis added). Where speech falls "within the general ambit of First Amendment protection" but outside of the "more narrow protection" afforded to the speech of public employees under *Pickering*, a governmental entity's ability to discharge or discipline an employee does not provide it with a license to "impose additional sanctions" through the invocation of its "sovereign authority." *Schlarp v. Dern*, 610 F.Supp.2d 450, 464, n. 8 (W.D.Pa. 2009). The fact that a public employee's speech may lack constitutional protection from *employment-related discipline* does not mean that such speech is "totally beyond the protection of the First Amendment." *Connick*, 461 U.S. at 147. There are many forms of expression that could justify a public employee's termination or suspension even though they would not provide a lawful basis for subjecting the employee to sanctions extending beyond the employment relationship (*e.g.*, criminal punishment, civil liability, or the revocation of a professional license necessary to enable the employee to pursue a particular calling or seek employment with other entities). *Schlarp*, 610 F.Supp.2d at 464, n. 8.

A plaintiff seeking to prevail in a case governed by *Pickering* must establish the existence of a causal relationship between his or her speech and the challenged employment action. *Stephens v. Kerrigan*, 122 F.3d 171, 180 (3d Cir. 1997). In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court made the following observations about the issue of causation in the First Amendment context:

A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to

19

rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Doyle*, 429 U.S. at 286. Under *Doyle*, a plaintiff asserting a First Amendment retaliation claim bears the initial burden of demonstrating that his or her speech was a "substantial" or "motivating" factor behind the employment action at issue. *Id.* at 287. If such a showing is made, the burden shifts to the defendant to prove, by a preponderance of the evidence, that it would have taken the same action in the absence of the employee's speech. *Id.* The issue of causation presents a question of fact. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

The Petition Clause provides individuals with a "particular freedom" to communicate with public officials. *McDonald v. Smith*, 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). "Whereas the Free Speech Clause protects the right to 'wide-open' debate, the Petition Clause encompasses only activity directed to a government audience." *Foraker v. Chaffinch*, 501 F.3d 231, 237 (3d Cir. 2007). In *Borough of Duryea v. Guarnieri*, 131 S.Ct. 2488, 2496, 180 L.Ed.2d 408 (2011), the Supreme Court held that the rule adopted in *Connick* applies with equal force to claims arising under the Petition Clause, and that constitutional protection does not extend to grievances relating only to matters such as "working conditions, pay, discipline, promotions, leave, vacations, and terminations." Speaking through Justice Kennedy, the Supreme Court explained:

Of course in one sense the public may always be interested in how government officers are performing their duties. But as the *Connick* and *Pickering* test has evolved, that will not always suffice to show a matter of public concern. A petition that "involves nothing more than a complaint about a change in the employee's own duties" does not relate to a matter of public concern and accordingly "may give rise to discipline without imposing any special burden of justification on the government employer." *United States v. Treasury Employees*, 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). The right of a public

> employee under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process. It is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts.

*Guarnieri*, 131 S.Ct. at 2501. In the aftermath of *Guarnieri*, public employees enjoy constitutional protection from retaliatory discipline for their petitioning activities only when such activities "seek to advance political, social, or other ideas of interest to the community as a whole." *Id.* at 2498.

Mitchell alleges that each of the individual defendants violated her First Amendment rights by retaliating against her for complaints that she had voiced against Greener, Urbani and Potter. ECF No. 24 at ¶ 33. Two basic principles control the Court's consideration of these claims. First, a state official sued under § 1983 may be held personally liable only "for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In this context, liability cannot be premised on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In order to hold an individual defendant liable under § 1983, Mitchell must establish that he or she was personally involved in the violation of her First Amendment rights. *Evancho v. Fisher*, 423 F.3d 347, 353-354 (3d Cir. 2005). Second, the issue of causation pertaining to a First Amendment claim against a particular defendant generally turns on his or her "specific intent" at the time of the alleged retaliatory action. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006). In this vein, Mitchell must demonstrate that her expressive activities were a "substantial" or "motivating" factor behind the conduct engaged in by a particular defendant in order to hold that defendant liable for

violating her First Amendment rights.[7] *Ansell v. Ross Township*, Civil Action No. 09-1398, 2012 WL 1038825, at *28, 2012 U.S. Dist. LEXIS 43127, at *84-85 (W.D.Pa. Mar. 28, 2012).

The documentary record contains a copy of letter from Bonney to Mitchell dated May 18, 2008. ECF No. 32-3 at 15. The letter purported to inform Mitchell that she had been dismissed as a PSP cadet on April 28, 2008. *Id.* In her amended complaint, Mitchell alleges that she never received Bonney's letter. ECF No. 24 at ¶ 19. Mitchell avers that she learned of her termination during the middle of June 2008, when she received a "letter of termination" from Manning dated May 29, 2008. *Id.* During her deposition, Mitchell testified that she had received termination letters from both Manning and Bonney, and that both of the letters had been dated May 29, 2008. ECF No. 32-9 at 32.

Mitchell relies on the discrepancy involving the letters as evidence of Bonney's "involvement in the unlawful plan" to effectuate her dismissal. ECF No. 24 at ¶ 19. It is not entirely clear how Mitchell believes that the different dates appearing on the letters have probative value with respect to Bonney's alleged involvement in the termination decision. Miller approved Mitchell's dismissal on April 28, 2008. ECF No. 32-7 at 20. The manner in which Mitchell was informed of Miller's decision has no bearing on whether Bonney engaged in unconstitutional conduct.

In a declaration signed on October 27, 2011, Bonney stated that she had played no role in the decision to dismiss Mitchell. ECF No. 32-7 at 14, ¶ 2. Bonney further declared that her role had been limited to the ministerial duty of informing Mitchell of a dismissal decision that had

---

[7] The "specific intent" harbored by a particular defendant relates to whether an underlying violation of Mitchell's First Amendment rights can be established. *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006). It does not relate to whether an established constitutional violation is actionable under § 1983. *Board of County Commissioners v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)("Section 1983 itself 'contains no state-of-mind requirement independent of that necessary to state a violation' of the underlying federal right."), quoting *Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

already been made by Miller. *Id.* at 14-15, ¶ 3. Mitchell points to nothing in the record which contradicts Bonney's declaration. ECF No. 41 at 22. Nothing in the record suggests that Bonney played an active role in determining whether Mitchell's employment with the PSP should be terminated. Since Bonney had no personal involvement in the termination decision, the First Amendment claims asserted against her must be dismissed. *Evancho*, 423 F.3d at 353-354.

Karas testified that he had first become aware of Mitchell's involvement with the PSP in January 2008. ECF No. 40-1 at 3. By that time, Hocker had already recommended that Mitchell be dismissed. ECF No. 32-1 at 2-15. Karas was selected to handle the IAD investigation into the allegations contained in Mitchell's memorandum of December 21, 2007. ECF Nos. 33 & 40 at ¶ 53. Manning and Lomax both recommended Mitchell's dismissal while the IAD investigation was still underway. ECF No. 32-3 at 2-8. In a declaration signed on October 25, 2011, Miller stated that he had delayed making his decision concerning Mitchell's status until after the completion of the IAD investigation. ECF No. 32-7 at 18, ¶ 4. Karas interviewed Mitchell on March 4, 2008. ECF No. 32-5 at 5-44; ECF No. 32-6. Corporal Beth Santelli ("Santelli") was present for the interview. ECF No. 32-5 at 5. The investigation conducted by Karas also included interviews with the thirty-eight cadets who had graduated on December 21, 2007. ECF No. 32-7 at 3-4. The cadets apparently denied that Mitchell had been treated unfairly. *Id.* After reviewing the findings of the IAD investigation, Manning determined that the allegations contained in Mitchell's memorandum had been "unfounded." ECF No. 32-7 at 2-7. He articulated this determination in a report dated April 18, 2008. *Id.* On April 24, 2008, Brown recommended that Mitchell's employment with the PSP be terminated. *Id.* at 22. Miller formally dismissed Mitchell on April 28, 2008. *Id.* at 20.

23

In a declaration dated December 16, 2011, Mitchell blamed Urbani and Potter for turning the other cadets against her. ECF No. 42 at 4, ¶ 10. She did not deny that the cadets had refuted her allegations of unfair treatment during their interviews with Karas. Indeed, she stated that the cadets "hated" her.[8] *Id.* Mitchell's First Amendment claims against Karas appear to be based on his alleged failure to competently investigate her allegations of misconduct. *Id.* at 3-5, ¶¶ 9-13.

Nothing in the record suggests that Karas played an active role in terminating Mitchell's employment. Greener, Urbani and Potter were the "subjects" of the IAD investigation. ECF No. 32-7 at 2. Karas did not directly evaluate Mitchell's suitability to serve as a police officer. Had Karas uncovered evidence suggesting that Greener, Urbani and Potter were guilty of wrongdoing, he might have *prevented* Mitchell's discharge. After all, Miller decided not to proceed with the recommended dismissal precisely because he wanted to wait for the results of the IAD investigation. *Id.* at 18, ¶ 4. Nonetheless, it does not follow that Karas can be held liable for violating Mitchell's First Amendment rights merely because he found her "speech" to be lacking in credibility. If it were otherwise, a plaintiff could insulate himself or herself from impending disciplinary actions simply by questioning the basis for those actions. *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267-268 (3d Cir. 2007). Karas became involved in the matter *because of* Mitchell's "speech." Even if his investigation was somehow inadequate, his failure to affirmatively prevent the PSP from discharging Mitchell cannot be reasonably characterized as an attempt to retaliate against her for triggering the investigation in the first place. On the basis of the existing record, no reasonable trier of fact could conclude that Karas was personally involved in the challenged termination decision. *Gagliardi v. Fisher*, 513 F.Supp.2d 457, 473-474 (W.D.Pa. 2007)(finding an allegation that a state official had failed to cooperate in an

---

[8] Mitchell also indicated that Santelli had a grudge against her because of their interactions during the course of a "prior class." ECF No. 42 at ¶ 9.

investigation to be insufficient to establish the official's direct involvement in the constitutional violations alleged). The First Amendment claims asserted against Karas will be dismissed.

Unlike Bonney and Karas, the remaining individuals named as defendants played a direct role in the termination of Mitchell's employment. Greener, Urbani and Potter each charged Mitchell with infractions during the course of her training. ECF No. 32-1 at 20, 27-35, 38-47. Manning recommended Mitchell's dismissal on January 3, 2008. ECF No. 32-3 at 4-8. This recommendation was based, in large part, on the number of infractions that Mitchell had accumulated. *Id.* at 5, 7. Miller ultimately approved Mitchell's dismissal on April 28, 2008. ECF No. 32-7 at 20.

Mitchell alleges that these five individuals retaliated against her for complaining about the "unlawful treatment" that she had suffered at the hands of Greener, Urbani and Potter. ECF No. 24 at ¶ 33. Construing Mitchell's allegations to mean that she suffered retaliation because of the statements that she had made in her memorandum of December 21, 2007, the Defendants argue that the memorandum was prepared pursuant to her "official duties" and, therefore, unprotected from employer discipline under the rule established in *Garcetti*. ECF No. 34 at 5, n. 3. The record indicates that the memorandum was prepared at Manning's direction. ECF No. 32-3 at 9. Mitchell's First Amendment claims, however, are not based on the memorandum alone. Instead, they are also based on less formal complaints that she voiced on previous occasions. ECF No. 41 at 17.

Sergeant Calvin Andrews ("Andrews") served as the Station Commander for the Center during the fall of 2007. ECF No. 43-1 at ¶ 1. In a declaration dated December 17, 2011, Andrews stated that both Mitchell and her mother had contacted him and characterized the behavior of Urbani and Potter as "gender discrimination and harassment." *Id.* at ¶ 3. Andrews

25

further declared that he had spoken to Potter about the matter "and counseled him to avoid any actions that could be construed as discriminatory or retaliatory."[9] *Id.* at ¶ 4. In her declaration, Mitchell stated that Potter had directly confronted her about her conversation with Andrews, and that he had threatened to have her terminated if she continued to "stir the pot." ECF No. 42 at ¶ 3. She also declared that Potter had refused to let her speak with a "disciplinary officer" about the situation. *Id.* When questioned about her encounter with Potter, Mitchell testified as follows:

Q.     Did you know that there's an Equal Opportunity Office?

A.     Yep. Yes. Can I elaborate on that?

Q.     Yeah.

A.     I was told by Trooper Potter that if I did anything stupid or silly, if I come back on him by reporting him in whatever means, that he would have me fired. I'd be terminated. I'd be gone. He's on the phone right now with Selgrath, I'd be gone. And this was not a democracy at the academy. So I don't—you know, for me to report that, you know, my taking the chance of being terminated, because I want to tell the truth or I just sit here and hunker down and take the abuse until the end, until I graduate. Well, I didn't graduate.

ECF No. 32-9 at 28. This testimonial evidence could enable a reasonable trier of fact to conclude that Potter charged Mitchell with infractions in retaliation for her complaints to Andrews.[10]     Given the impact that such infractions had on Mitchell's employment prospects,

---

[9] Andrews also accused Potter of going outside of the PSP's chain of command and improperly submitting "reports" into Mitchell's employment file without his knowledge. ECF No. 43-1 at ¶ 5. It is not clear whether Potter took those actions before or after his conversation with Andrews about the complaints that Mitchell and her mother had voiced. The sequence of events has clear relevance to the issue of causation, since Potter could not have had a motive to retaliate against Mitchell unless the complaints had already been revealed to him. *Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.").

[10] The Court notes that on December 5, 2007, Potter charged Mitchell with an infraction for addressing a question to Andrews rather than to him. ECF No. 32-1 at 47.

it is clear that they could have "deterred a person of ordinary firmness from exercising his or her First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 173 (3d Cir. 2006).

It is not clear how Mitchell believes that her complaints to Andrews or her memorandum to Manning were "substantial" or "motivating" factors behind the actions taken by the other defendants. *Reilly v. City of Atlantic City*, 532 F.3d 216, 224 (3d Cir. 2008). Although Andrews relayed Mitchell's complaints to Potter, Mitchell points to nothing in the record which suggests that Greener and Urbani knew about them. ECF No. 41 at 19; *Gorum v. Sessoms*, 561 F.3d 179, 188 (3d Cir. 2009)(recognizing that a plaintiff attempting to establish a First Amendment violation on a theory of retaliation must demonstrate that the relevant defendant was aware of his or her constitutionally protected conduct at the time of the alleged retaliatory act). Mitchell's memorandum to Manning postdated the infractions charged to her by Greener, Urbani and Potter. ECF No. 32-3 at 10-13. Moreover, the memorandum was written precisely because Hocker had already recommended Mitchell's dismissal. ECF No. 32-1 at 2-15. Manning's recommendation was consistent with that of Hocker. ECF No. 32-3 at 4-8. Instead of immediately acting on the collective advice of Hocker, Manning and Lomax, Miller delayed Mitchell's discharge so that Karas could complete the IAD investigation. ECF No. 32-7 at 18, ¶ 4. The investigation uncovered no evidence of wrongdoing on the part of Greener, Urbani and Potter.[11]   ECF No. 32-7 at 5, 7. When Miller finally decided to discharge Mitchell, he acted in accordance with the recommendations made by Hocker, Manning, Lomax and Brown. ECF No. 32-7 at 20, 22. Hocker made his recommendation before Mitchell's complaints had come to light. ECF No. 32-1 at 2-15. An employer's decision to proceed "along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."

---

[11] In his declaration, Andrews stated that Karas had never interviewed him about his earlier conversation with Mitchell. ECF No. 43-1 at ¶ 6. While this alleged omission by Karas may have some bearing on the adequacy of his investigation, it is not indicative of a retaliatory animus harbored by the other defendants.

*Clark County School District v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(*per curiam*). Consequently, Mitchell can satisfy her evidentiary burden pertaining to causation *only* with respect to her First Amendment claims against Potter.

The remaining question is whether Mitchell's complaints to Andrews enjoyed constitutional protection from employer discipline under *Pickering* and its progeny.[12] Under the present circumstances, there is no need for the Court to consider whether Mitchell voiced her complaints pursuant to her official duties, or whether her interest in speaking was outweighed by the PSP's interest in maintaining "the effective and efficient management of its internal affairs." *Guarnieri*, 131 S.Ct. at 2500. On the basis of the existing record, the Court cannot conclude that Mitchell's statements to Andrews related to matters of public concern. *Id.* at 2501.

"Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008). The "public concern" inquiry required under *Connick* presents a question of law for the Court to decide. *Connick*, 461 U.S. at 148, n. 7; *Page v. Connecticut Dept. of Public Safety*, 185 F.Supp.2d 149, 161 (D.Conn. 2002)("The question of whether certain speech is protected under the First Amendment is one of law, not fact."). A critical factor in determining whether an employee's expression relates to a matter of public concern is whether it is fairly analogous to expressive or petitioning activities typically "engaged in by citizens who do not work for the government." *Garcetti*, 547 U.S. at 423. When a public employee speaks only about internal personnel matters, "there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

---

[12] Mitchell's complaints clearly enjoyed First Amendment protection in a more general sense. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 283-284 (3d Cir. 2004).

28

According to Andrews, Mitchell reported to him that she had been "the subject of gender discrimination and harassment by Urbani and Potter." ECF No. 43-1 at ¶ 3. Mitchell testified that she had complained to Andrews about "being targeted as a female." ECF No. 32-9 at 27. The record does not reveal the precise *content* of Mitchell's statements. That is problematic from an evidentiary standpoint, since the existence or absence of constitutional protection under *Pickering* often turns on precisely what a public employee says to his or her employer. *Connick*, 461 U.S. at 147-148 ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a *given statement*, as revealed by the whole record.")(emphasis added). The *context* in which Mitchell complained, however, suggests that she was speaking only about the circumstances surrounding her status as a cadet and prospects for graduation. There is nothing in the record which suggests that she was merely trying "to participate, as a citizen, in the process of deliberative democracy." *Guarnieri*, 131 S.Ct. at 2500.

Mitchell argues that "gender discrimination and harassment are inherently matters of public concern." ECF No. 41 at 17. Contrary to her belief, *Connick*'s application to complaints about sex-based discrimination is considerably less categorical. When a public employee complains only about generic forms of sex-based discrimination perpetrated against him or her in the workplace, he or she does not speak about matters of public concern. *Gross v. Town of Cicero*, 619 F.3d 697, 706 (7th Cir. 2010); *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008); *Campbell v. Galloway*, 483 F.3d 258, 268 (4th Cir. 2007); *Wilhelm v. City of Calumet City*, 409 F.Supp.2d 991, 998 (N.D.Ill. 2006); *Lehmuller v. Incorporated Village of Sag Harbor*, 944 F.Supp. 1087, 1095 (E.D.N.Y. 1996). In *Azzaro v. County of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit specifically recognized that some complaints about sexual harassment do not involve matters of public concern. The

29

protected status of complaints alleging sexual harassment is a "particularly thorny question" that generally depends upon "the way in which the complaints [a]re made and the scope of the harassment" alleged. *Olivieri v. County of Bucks*, 811 F.Supp.2d 1112, 1126, n. 8 (E.D.Pa. 2011).

In *Azarro*, a female employee of a public entity alleged that the executive assistant to an elected official had improperly started to loosen and remove her clothing during the course of a private meeting. *Azzaro*, 110 F.3d at 970. The employee's job was eliminated several months after she had reported the incident. *Id.* at 971-973. She later brought an action against several defendants, alleging that she had been discharged in retaliation for her speech, in violation of the First Amendment. *Id.* at 973. Because the communications at issue concerned allegations of sexual misconduct perpetrated by an individual "exercising authority in the name of a public official," the Court of Appeals reasoned that they "should be regarded as [addressing] a matter of public concern unless something in their form or context deprived them of their value to the process of self-governance." *Id.* at 978-979. Finding nothing that significantly detracted from the value of those communications to "the process of self-governance," the Court of Appeals concluded that they related to a matter of concern to the general public. *Id.* at 979. It was noted, however, that some complaints about workplace harassment would not satisfy *Connick*'s "public concern" requirement. *Id.* at 980 ("[W]e do not suggest that all public employee complaints about sexual harassment are matters of public concern.").

Where an allegation of sexual harassment addresses a matter of public concern, it may enjoy constitutional protection under *Pickering* even if the misconduct alleged is not sufficiently

30

severe or pervasive to create an actionable violation of Title VII.[13]   *Campbell*, 483 F.3d at 270
(explaining that constitutional protection under *Pickering* "is not limited to complaints about
conduct that is ultimately found to violate Title VII").  It does not follow, however, that every
violation of Title VII committed by a public employer necessarily implicates matters of public
concern.  The sexual misconduct alleged in *Azzaro* was found to implicate matters of public
concern "under all of the surrounding circumstances."   *Azzaro*, 110 F.3d at 980.   The
"surrounding circumstances" involved a person "exercising authority in the name of a public
official" who, during a work-related meeting, allegedly opened the lapels of a woman's blazer
and "pulled her blouse out of her slacks."  *Id.* at 970, 978.  The harassing contact alleged by the
plaintiff in that case was severe.  *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001)(stating that
"direct contact with an intimate body part constitutes one of the most severe forms of sexual
harassment").  The alleged behavior was arguably criminalized under Pennsylvania law.  18 PA.
CONS. STAT. §§ 3101, 3126(a).  The reasoning employed in *Azzaro* does not place Mitchell's
complaints about unfair treatment within the ambit of *Pickering*.  Unlike the plaintiff in *Azzaro*,
Mitchell did not claim to have been assaulted or harassed in a sexually-oriented manner.  Instead,
she merely complained that her superiors had subjected her to unfair treatment "because she was
a woman."  ECF No. 24 at ¶ 37.  Although the alleged mistreatment may have adversely
impacted Mitchell's status as a cadet and prospects for continued employment with the PSP, her
complaints to Andrews were not of sufficient "value to the process of self-governance" to
warrant constitutional protection.[14]  *Azzaro*, 110 F.3d at 979-980.

---

[13] Sexual harassment violates Title VII only when it is "sufficiently severe or pervasive" to alter the "terms, conditions, or privileges" of one's employment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); 42 U.S.C. § 2000e-2(a)(1).

[14] As discussed earlier, Mitchell cannot establish a causal relationship between her memorandum to Manning and Miller's decision to dismiss her.  *Clark County School District v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(*per curiam*)(explaining that an employer's decision to proceed "along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").  In any event,

Employees in Mitchell's situation are not without legal protection from retaliation. They are protected by a "powerful network of legislative enactments." *Garcetti*, 547 U.S. at 425. Mitchell seeks redress under some of those enactments in this very case. 42 U.S.C. §§ 2000e-3(a), 12203(a); 43 PA. STAT. § 955(d). The Free Speech and Petition Clauses of the First Amendment do not provide public employees with a license "to circumvent these legislative enactments when pursuing claims based on ordinary workplace grievances." *Guarnieri*, 131 S.Ct. at 2497. Statutory protections "are subject to legislative revision" and can be tailored to secure the "unique needs" of governmental entities. *Id.* Governmental employers would be unable to function if every personnel decision were to be regarded as a matter of constitutional significance. *NASA v. Nelson*, 131 S.Ct. 746, 758, 178 L.Ed.2d 667 (2011). Accordingly, the Defendants' motion for summary judgment will be granted with respect to all of Mitchell's First Amendment claims. ECF No. 24 at ¶¶ 32-35.

## B.    The Federal Discrimination Claims

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST., AMEND. XI. The Supreme Court has construed the Eleventh Amendment "to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). "This presupposition is based on the understanding that 'the States entered

---

however, the memorandum did not address matters of concern to the general public. ECF No. 32-3 at 10-13. Therefore, Mitchell cannot establish an actionable violation of the First Amendment even if it is assumed (contrary to the record) that she was discharged in retaliation for statements that she had made in the memorandum. *Board of Duryea v. Guarnieri*, 131 S.Ct. 2488, 2500, 180 L.Ed.2d 408 (2011)(declaring that an employee's constitutional interest in speaking or petitioning "must give way" when he or she speaks or petitions "as an employee on a matter of purely private concern").

the federal system with their sovereignty intact,' that '[t]he Judicial power of the United States' is limited by this sovereignty, and that a State will not be subjected to suits in federal court brought by private individuals unless it has consented to such suits either expressly or in the 'plan of the convention.'" *Burns v. Alexander*, 776 F.Supp.2d 57, 72 (W.D.Pa. 2011)(brackets in original), quoting *Blatchford*, 501 U.S. at 779. Pennsylvania has not waived its Eleventh Amendment immunity from suit. 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. § 8521(b). As an arm of the Commonwealth of Pennsylvania, the PSP is entitled to Eleventh Amendment immunity. *Williams v. Pennsylvania State Police-Bureau of Liquor Control Enforcement*, 108 F.Supp.2d 460, 465 (E.D.Pa. 2000).

Congress has the "power to enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment. U.S. CONST., AMEND. XIV, § 5. "When it validly invokes this power, Congress may abrogate the States' Eleventh Amendment immunity and subject them to suits brought by private individuals." *Burns*, 776 F.Supp.2d at 72. "When Congress takes this action, it must make its intention to abrogate the States' constitutionally-secured immunity from suit 'unmistakably clear in the language of the statute' authorizing the types of civil actions in question." *Id.*, quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447-457, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court held that Congress has validly abrogated the States' Eleventh Amendment immunity in actions brought under Title VII. For this reason, the Eleventh Amendment raises no bar to Mitchell's Title VII claims against the PSP. In support of their motion for summary judgment, the Defendants argue that Mitchell's ADA claims against the PSP are barred by the Eleventh Amendment. ECF No. 34 at 19-20.

**1. The ADA Claims**

33

Title I of the ADA bars covered employers from discriminating against "disabled" individuals "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A covered entity engages in a prohibited form of "discrimination" when it fails or refuses to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). Congress has clearly expressed its intention to abrogate the States' Eleventh Amendment immunity in actions arising under the ADA. 42 U.S.C. § 12202.

A State's discrimination against disabled individuals runs afoul of the Equal Protection Clause only where it is premised "on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Unlike Title I, the Fourteenth Amendment does not affirmatively require the States to "accommodate" the specific needs of disabled individuals. *McKivitz*, 769 F.Supp.2d at 831. Given the vast differences in the requirements of the Equal Protection Clause and Title I in relation to the States' treatment of disabled individuals, the Supreme Court concluded in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 366-374, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), that Title I did not constitute "appropriate legislation" to "enforce" the Fourteenth Amendment. Because Title I's substantive requirements were not "congruent and proportional" to the objective of deterring actual violations of the Equal Protection Clause, the Supreme Court

34

determined that Title I had not validly abrogated the States' Eleventh Amendment immunity.[15] *Garrett*, 531 U.S. at 360, 374. The Defendants rely on *Garrett* for the proposition that Mitchell's ADA claims are barred by the Eleventh Amendment.[16] ECF No. 34 at 20.

In *United States v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a case involving Title II[17] of the ADA, the Supreme Court clarified that the Eleventh Amendment does not bar actions under the ADA based on "conduct that independently violate[s] the provisions of § 1 of the Fourteenth Amendment." Where an ADA plaintiff alleges conduct that concurrently violates both the Fourteenth Amendment and the ADA, the claim may proceed regardless of whether the relevant statutory provision validly "enforces" the Fourteenth Amendment in other contexts.[18] *Georgia*, 546 U.S. at 157 ("In this respect, Goodman differs *from the claimants* in our other cases addressing Congress's ability to abrogate sovereign immunity pursuant to its § 5 powers.")(emphasis added); *Tennessee v. Lane*, 541 U.S. 509, 551-552, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004)(Rehnquist, C.J., dissenting)(observing that, under

---

[15] Although Title I is a valid exercise of Congress' authority under the Commerce Clause, legislation enacted pursuant to that constitutional power cannot be used to abrogate the States' Eleventh Amendment immunity. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 78-79, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 636, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 672, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 63-73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

[16] Mitchell offers no response to the Defendant's argument concerning the PSP's immunity from suit under the Eleventh Amendment. ECF No. 41 at 24.

[17] Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[18] It is worth noting that Justices Scalia, Kennedy and Thomas found Title II's abrogation of the States' Eleventh Amendment immunity to be valid in cases involving actual violations of the Fourteenth Amendment even though they had previously found the abrogation to be invalid in other contexts. *United States v. Georgia*, 546 U.S. 151, 157-159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006); *Tennessee v. Lane*, 541 U.S. 509, 538-566, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004)(dissenting opinions of Rehnquist, C.J., Scalia, J., and Thomas, J.). The rationale unanimously adopted by the Supreme Court in *United States v. Georgia*, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), inevitably leads to the conclusion that a plaintiff alleging conduct which concurrently violates Title I and the Fourteenth Amendment can overcome a State's Eleventh Amendment immunity even though Title I does not validly abrogate that immunity in other contexts. *Georgia*, 546 U.S. at 158 ("While the Members of this Court have disagreed regarding the scope of Congress's 'prophylactic' enforcement powers under § 5 of the Fourteenth Amendment, no one doubts that § 5 grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions.")(internal citations omitted; emphasis in original).

the majority's "as applied" approach, the Eleventh Amendment would not bar actions under Title I seeking to redress "irrational employment discrimination"). Since the Supreme Court has already determined that the requirements of Title I are not "congruent and proportional" to the objectives of remedying and deterring violations of the Equal Protection Clause, Mitchell's ADA claims against the PSP can proceed *only* if they are based on conduct that actually violates the Fourteenth Amendment.[19] *Georgia*, 546 U.S. at 157-159.

The record indicates that, during the course of her training, Mitchell suffered from a number of physical impairments which limited her ability to satisfy the PSP's training requirements. Mitchell's injuries forced her to "conditionally resign" from the PSP on three separate occasions. ECF No. 32-3 at 26-31. The PSP had no *constitutional* obligation to "accommodate" Mitchell's impairments or provide her with alternative ways of satisfying her graduation requirements. *McKivitz*, 769 F.Supp.2d at 831 (explaining that "the Fourteenth Amendment does not affirmatively require state and local entities to 'accommodate' the needs of 'handicapped' or 'disabled' individuals"). Under the Equal Protection Clause, a public employer remains free to enforce "job-qualification requirements which do not make allowance[s] for the disabled." *Garrett*, 531 U.S. at 368. Mitchell's ADA claims are not based on conduct which concurrently violates both Title I and the Fourteenth Amendment. *Georgia*, 546 U.S. at 157-159. In accordance with the holding in *Garrett*, Mitchell's ADA claims are barred by the

---

[19] A plaintiff proceeding under a statute which satisfies the "congruence and proportionality" test can overcome a State's Eleventh Amendment immunity *without* alleging conduct that independently violates the Fourteenth Amendment. *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 737-740, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). In determining whether a statutory mandate or prohibition is "appropriately" designed to deter actual constitutional violations, the Supreme Court considers whether Congress has "identif[ied] a pattern of constitutional violations and tailor[ed] a remedy congruent and proportional to the documented violations." *Coleman v. Court of Appeals of Maryland*, 132 S.Ct. 1327, 1338, 182 L.Ed.2d 296 (2012). That inquiry is inapt, however, when a plaintiff brings a statutory claim based on conduct which independently violates the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 157-159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006).

Eleventh Amendment. *Benn v. First Judicial District of Pennsylvania*, 426 F.3d 233, 238-239 (3d Cir. 2005).

The Supreme Court has indicated that a state employee proceeding under Title I may seek prospective relief against an official-capacity defendant pursuant to the rationale articulated in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908). *Garrett*, 531 U.S. at 374, n. 9. The Defendants correctly point out that Mitchell's ADA claims are asserted solely against the PSP. ECF No. 34 at 20. The ADA claims are not asserted against any individuals in their official capacities. ECF No. 24 at ¶¶ 39-44. Since Mitchell attempts to proceed only against the PSP, her claims are barred by the Eleventh Amendment irrespective of whether she is seeking prospective relief. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(declaring that "the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment"). In light of this determination, the Court has no occasion to consider whether Mitchell was statutorily "disabled" during the relevant period of time. ECF No. 34 at 20-25. Even if the PSP violated the ADA, the Court has no jurisdiction to entertain Mitchell's disability-based discrimination claims. *Garrett*, 531 U.S. at 360. The Defendants' motion for summary judgment will be granted with respect to Mitchell's ADA claims. ECF No. 24 at ¶ 41.

### 2. The Title VII Claims

Given that Congress has validly abrogated the States' Eleventh Amendment immunity in actions brought under Title VII, the Court has jurisdiction to entertain Mitchell's Title VII claims. *Fitzpatrick*, 427 U.S. at 447-457. Title VII's anti-discrimination provision, which is codified at 42 U.S.C. § 2000e-2(a), provides:

### § 2000e-2. Unlawful employment practices

37

**(a) Employer practices.**  It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  Mitchell alleges that the PSP violated § 2000e-2(a) by disciplining and discharging her because of her sex.  ECF No. 24 at ¶¶ 40, 43-44.  She also avers that the PSP violated Title VII by subjecting her to an actionable "hostile work environment" on the basis of a sex-based animus.  *Id.* at ¶ 42.

### a.    The Claims Based on the Disciplinary and Discharge Decisions

Since this is an employment discrimination case in which no "direct evidence" of discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending motion for summary judgment.[20]  In an employment discrimination case of this kind, the plaintiff must establish a *prima facie* case of illegal discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If a *prima facie* case of discrimination is established, the defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an adverse manner.  *Id.* at 802-

---

[20] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which "direct evidence" of discrimination is presented.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).  "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant.  *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995).  The evidence presented by Mitchell does not constitute "direct evidence" of discrimination.

803. If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination. *Id.* at 804-805. Evidence suggesting that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. In order to establish a *prima facie* case of discrimination, the plaintiff need only show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was aggrieved by an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination. *Shah v. Bank of America*, 598 F.Supp.2d 596, 604 (D.Del. 2009). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999). The *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003). Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto v. Wyeth Pharmaceuticals*, 619 F.Supp.2d 142, 153, n. 3 (W.D.Pa. 2007)(emphasis in original), citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). A *prima facie* case "raises an inference of discrimination" sufficient to shift

39

the burden of production to the defendant. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). This inference is based on an assumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors." *Id.*

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254-255. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-256. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon

the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion. *St. Mary's Honor Center*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.")(emphasis in original). Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's *prima facie* case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, "but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100, quoting *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Depending on the circumstances of the particular case, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149. Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's *prima facie* case, the probative value of the evidence discrediting the defendant's proffered reasons for the challenged

employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate. *Id.* at 148-149.

The PSP's 125th cadet class initially consisted of sixty members. ECF Nos. 33 & 40 at ¶ 2. Thirty-eight members of the class graduated on December 21, 2007. *Id.* at ¶ 3. Among the graduates were thirty-six males and two females. *Id.* Mitchell was obviously one of the twenty-two cadets who did not graduate.

The parties have not submitted statistics describing the gender breakdown of the twenty-two unsuccessful class members. In a declaration signed on October 25, 2011, Manning stated that he had recommended the dismissal of a male member of the 125th cadet class "for competency reasons." ECF No. 32-7 at 10, ¶ 4. The male cadet was formally dismissed by the PSP on March 10, 2008. *Id.* at 12. During a deposition, Manning testified that "the majority" of the PSP's cadets typically dropped out before graduating, since the "environment" caused them to reconsider their aspirations to work as police officers. ECF No. 40-3 at 15. He went on to state that each class would lose "a small portion" of its members because of an "inability to maintain standards." *Id.* When asked about "the attrition rate of females as compared with males," Manning testified that only three or four females had been "dismissed" during his tenure as the Director of the Training Division. *Id.* He asserted that females who remained in their classes generally graduated on a regular basis. *Id.* Manning was unable to provide detailed statistical information about the respective graduation rates for male and female cadets. *Id.*

Mitchell is not precluded from establishing a *prima facie* case of discrimination simply because a male cadet was dismissed along with her, or because two female cadets were able to graduate. The minimal statistical evidence contained in the record demonstrates only that the

42

PSP was willing to dismiss *someone* outside of Mitchell's protected class, or to retain *some* cadets who shared her protected trait. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3d Cir. 1999). Since that is "presumably true of all but the most misogynistic employers," it does not preclude a determination that Mitchell was treated less favorably than similarly-situated male cadets. *Id.* Evidence pertaining to the genders of the successful cadets is of little probative value in the absence of evidence pertaining to the genders of the unsuccessful cadets. *Cuddy v. Wal-Mart Super Center, Inc.*, 993 F.Supp. 962, 968 (W.D.W.Va. 1998)(remarking that "statistics about those hired are meaningless without a greater context"). Furthermore, the limited information available about the forty members of the 125th cadet class whose genders are known would appear to suggest that females were "dismissed" at a much higher rate than males. When the two "dismissed" cadets are viewed in relation to the thirty-eight graduates, it becomes apparent that the PSP "dismissed" one out of three females and one out of thirty-seven males. Therefore, the mere fact that one male cadet shared Mitchell's fate does not entitle the PSP to summary judgment. The evidence must be considered in a more comprehensive manner.

Mitchell points to nothing in the record which suggests that Miller, Bonney, Manning, Karas or Selgrath discriminated against her because of her sex. ECF No. 41 at 20-21. Indeed, the averments in the amended complaint relating to Mitchell's claims under the Equal Protection Clause and the PHRA directly reveal that her sex-based discrimination claims are based solely on the actions and motivations of Greener, Urbani and Potter. ECF No. 24 at ¶¶ 36-38, 45-48. To the extent that Mitchell bases her claims directly on the infractions charged to her by those three individuals, she can hold the PSP liable under Title VII by demonstrating that a similarly-situated male would not have been charged with those infractions. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)(explaining that "a tangible

employment action taken by a supervisor becomes for Title VII purposes the act of the employer"). If Mitchell surmounts that hurdle, she can hold the PSP liable for the decision to terminate her employment by showing that Greener, Urbani or Potter *intended* that the charged infractions would result in her discharge, and that the infractions *proximately caused* her discharge. *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011); *McKenna v. City of Philadelphia*, 649 F.3d 171, 177-179 (3d Cir. 2011).

Under the present circumstances, Mitchell can easily establish a causal relationship between the infractions and Miller's approval of her dismissal. Hocker's initial recommendation that Mitchell be dismissed was directly based on the number of infractions that she had accumulated. ECF No. 32-1 at 2-16. Manning similarly relied on the infractions when he recommended Mitchell's dismissal. ECF No. 32-3 at 4-8. Lomax concurred with Manning's recommendation "in its entirety." *Id.* at 3. Miller delayed making a decision concerning Mitchell's employment status in order to give Karas an opportunity to investigate Mitchell's "allegations of unfair treatment." ECF No. 32-7 at 18, ¶ 4. After reviewing the findings of Karas' IAD investigation, Manning determined that Mitchell's complaints had been "unfounded." *Id.* at 2-7. Brown proceeded to recommend that Mitchell be dismissed because of her "competency issues" and "other documented infractions." *Id.* at 22. Miller approved Mitchell's dismissal in accordance with that recommendation. *Id.* at 18, ¶ 6. In light of this unrefuted documentary evidence, Mitchell can establish that the accumulation of infractions charged to her by Greener, Urbani and Potter constituted a "proximate cause" of her discharge. *Staub*, 131 S.Ct. at 1192.

The critical question is whether Mitchell's superiors charged her with infractions because of her sex. On October 24, 2007, Greener charged Mitchell with an infraction for conversing

with Kurt Salak ("Salak"), a male cadet, during the course of a swimming exercise. ECF No. 32-1 at 38-40. Cadets were apparently required to remain silent during the exercise. The illicit conversation started when Salak asked Mitchell how many laps they had completed. ECF No. 32-11 at 10. Mitchell verbally responded to Salak's inquiry. *Id.* Greener testified that he had charged both Mitchell and Salak with infractions for the conversation. *Id.* Nevertheless, he stated that Salak had immediately accepted responsibility for his actions, and that Mitchell had tried to make excuses for violating the no-speaking rule. *Id.* Greener asserted that Mitchell had been required to perform "flutter kicks" and "push-ups" because of her defiant attitude. *Id.* at 10-11. Salak was not required to engage in those exercises. ECF No. 42 at ¶ 15.

Mitchell got married shortly before starting her training as a member of the 125th cadet class. ECF No. 32-9 at 4. She had previously trained under the name of Danielle Flenner, which was her maiden name. ECF No. 42 at ¶¶ 14-15. In her declaration, Mitchell stated that Greener had mockingly referred to her as "Cadet Flenner" after her wedding, accusing her of getting married and changing her last name solely to avoid his scrutiny. *Id.* She further declared that Greener had expressed an intention to make sure that she would never become a member of the PSP's force. *Id.* at ¶ 14. When asked how Greener, Urbani and Potter had harassed her because of her sex, Mitchell testified as follows:

> Q. All right. Very, very quickly, paragraph 23, you say Potter, Greener and Urbani, but particularly Potter, systematically harassed you when you were at the academy, treating her with open contempt and hostility because she was injured and because she was a woman. Opposing Counsel had asked you some questions about this. How did Potter do that?
>
> A. He told me that, first of all, I was pathetic and that I was never going to make it on the road. My injuries were fake. I convinced the doctors that my injuries were real. The doctors didn't know what they were talking about. The doctors are obviously fake, too. He was informed by Trooper Greener, who I was and what I was all about. Trooper Greener told him

45

> that—Trooper Greener told me that I was the most pathetic female he's
> ever seen come through this academy.

Q.    Did he use the word female?

A.    Yes, he did.   My first week there, he said you are the worst, pathetic
      female I've ever seen come through this academy.   You've only been here
      a week.   Second time I was there Trooper Greener told me that since I
      changed my name, I thought I was going to fly under the radar and he
      wouldn't recognize who I was.   But he knows who I am.   My last name is
      Flinner (phonetic) and that's who I am to him.   Trooper Potter told me that
      when I'm out on the road and they see me as a female, I'm not going to be
      intimidating to them.   I'm just another Frieda.   Once again, I'm pathetic.

Q.    Who is Frieda?

A.    Frieda is their terms of—Fred and Frieda, the common criminals in
      Western Pennsylvania.   When they see me on the road as a female, I
      won't—they won't—I'm not going to be intimidating to them.   He ran by
      me twice, I remember during two runs, saying you know you think you're
      going to do what you want, you run this place.   Just admit it, Mitchell, you
      said it, you'll run this place.

ECF No. 32-9 at 41.   This testimony, if believed by a trier of fact, could establish that Greener

and Potter demeaned Mitchell in gender-specific terms.   *Waldron v. SL Industries, Inc.*, 56 F.3d

491, 502 (3d Cir. 1995)(recognizing the relevance of trait-based comments made by those

responsible for personnel actions in determining whether those actions have been taken for

discriminatory reasons).   Although Mitchell accuses Urbani of discriminating against her

because of her sex, she does not provide evidence from which a jury could infer that he acted on

the basis of a sex-based animus.   ECF No. 42 at ¶¶ 3-4, 6, 9-10.

     The infraction pertaining to Mitchell's conversation with Salak during a swimming

exercise appears to be the only infraction charged to her by Greener.   ECF No. 32-1 at 38-40.

That incident occurred during Mitchell's limited time at the Academy in Hershey.   Since

Mitchell and Salak were both charged with infractions, no reasonable jury could conclude that

Mitchell's infraction was charged because of her sex. *Howard v. Blalock Electric Service, Inc.*, 742 F.Supp.2d 681, 702-704 (W.D.Pa. 2010)(recognizing that discriminatory harassment of a verbal nature does not necessarily mean that adverse personnel actions were taken for discriminatory reasons).

Mitchell was charged with multiple infractions during the course of her time at the Center. ECF No. 32-1 at 20-37, 41-47. Several of those infractions were charged to her by Potter. *Id.* at 31-33, 41-47. As discussed earlier, Mitchell testified that Potter had threatened to have her terminated if she continued to voice complaints about his conduct. ECF No. 32-9 at 28. Where a supervisor retaliates against an employee who complains about sex-based discrimination, an inference that the supervisor acted on the basis of a sex-based animus may be drawn.[21] *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)(recognizing that an "intentional response" to an "allegation of sex discrimination" can be viewed as a form of "discrimination" because of the "nature of the complaint"). The Court notes that, on December 5, 2007, Potter charged Mitchell with an infraction for addressing a question to Andrews rather than to him. ECF No. 32-1 at 47. In her declaration, Mitchell accused Potter of denying her access to Hocker, who had been serving as the PSP's "disciplinary officer" during her time at the Center. ECF No. 42 at ¶¶ 2-3. Mitchell apparently wanted to speak with Hocker about the manner in which Potter and Urbani had been treating her. *Id.* In addition, Mitchell accused Potter of stating that she would "never make it as

---

[21] In making this observation, the Court does not mean to suggest that a plaintiff can establish a violation of Title VII's anti-discrimination provision simply by establishing a violation of its anti-retaliation provision. The two provisions prohibit distinct forms of discrimination. *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 63, 126 S.Ct. 2405, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)("The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct."). Nevertheless, a retaliatory motive based on a complaint about trait-based discrimination can sometimes be indicative of a disdain for those who bear the relevant trait. *Gomez-Perez v. Potter*, 553 U.S. 474, 479-482, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008). The categories of discrimination prohibited by the anti-discrimination provision and the anti-retaliation provision are not mutually exclusive. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 456-457, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).

a cadet" *because* she was a woman. *Id.* at ¶ 4. In her supplemental memorandum to Karas,
Mitchell stated as follows:

> During several physical punishment drills, Trooper Potter told me that I was a
> disgrace and an embarrassment to my class, to my step-father (who is a PSP
> Trooper) and to the department. He also told me that if he couldn't break me
> down physically, he would break me down mentally. On many occasions he told
> me that if I did graduate, I would never become a committed and confident
> Trooper.

ECF No. 32-3 at 24. If credited, this evidence could lead a reasonable jury to conclude that
Potter treated Mitchell more harshly than her fellow cadets because of her sex. Moreover,
Potter's alleged threat to have Mitchell terminated could support a finding that he *intended* to
facilitate her dismissal when he charged her with infractions.[22] *Staub*, 131 S.Ct. at 1194.

    The Defendants argue that Mitchell's "performance failures" constituted a legitimate,
nondiscriminatory reason for her discharge. ECF No. 34 at 17. A jury could certainly conclude,
on the basis of the existing record, that Mitchell was discharged solely because of her own
incompetence. When Karas interviewed Mitchell's classmates, none of them expressed the
belief that she had been treated unfairly. ECF No. 32-4 at 11-13. Indeed, some of her fellow
cadets stated that she had been given preferential treatment. *Id.* at 13. The critical question,
however, is whether Potter charged Mitchell with infractions on the basis of a discriminatory
animus. Since Mitchell was dismissed because she had accumulated multiple infractions, the
question of whether the PSP violated Title VII is inextricably intertwined with the underlying
question of whether Potter charged Mitchell with infractions because of her sex. ECF No. 32-1
at 16. If the infractions charged to Mitchell were discriminatory, the PSP cannot escape liability

---

[22] Mitchell's testimony concerning this threat is not uncontradicted. Potter testified that he had declined to turn in
one of Mitchell's infraction letters precisely because he did *not* want her to be dismissed. ECF No. 40-2 at 16. At
this stage, however, the Court must view the evidence in the light most favorable to Mitchell. *Thompson v. Wagner*,
631 F.Supp.2d 664, 681-682 (W.D.Pa. 2008).

simply by demonstrating that Karas' independent investigation into the matter uncovered no evidence of unlawful discrimination. *Staub*, 131 S.Ct. at 1192-1193; *McKenna*, 649 F.3d at 177-178. If Mitchell's testimony about Potter's threats is credited, a reasonable trier of fact could conclude that her sex was "more likely than not" a "motivating or determinative cause" of the PSP's decision to dismiss her. *Fuentes*, 32 F.3d at 765. The broader investigation into the perceptions of Mitchell's classmates did not fully account for the factual dispute relating to Potter's subjective motivations.[23] In his declaration, Andrews stated that Potter had gone outside of the PSP's chain of command and submitted reports into Mitchell's file without his knowledge. *Id.* at ¶ 5. Under these circumstances, the Court cannot conclude as a matter of law that Mitchell's sex lacked a causal relationship with the PSP's decision to terminate her employment. The Defendants' motion for summary judgment will be denied with respect to Mitchell's sex-based discipline and discharge claims under Title VII.[24] ECF No. 24 at ¶¶ 40, 43-44.

**b.    The "Hostile Work Environment" Claims**

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court declared that an employer unlawfully "discriminates" against an employee "because of" his or her "sex" when it perpetrates sex-based harassment that is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment. "Harassment which does not alter the 'terms, conditions, or privileges' of one's employment, however reprehensible it may be, does not run afoul of Title VII." *Howard*, 742 F.Supp.2d at 689. An isolated incident can amount to a change in the "terms, conditions, or privileges" of one's employment only if it is "extremely serious." *Faragher v. City of Boca*

---

[23] A factual dispute exists as to whether Karas interviewed Andrews during the course of the IAD investigation. ECF No. 43-1 at ¶ 6; ECF No. 44-1 at 2.

[24] Although the Defendants appear to question whether Mitchell's charge of discrimination was filed with the EEOC in a timely manner, the Court does not understand them to move for summary judgment on that basis. ECF No. 34 at 15-16, n. 8.

*Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In order for "an atmosphere

of sexual harassment or hostility to be actionable" under Title VII, "the offending behavior 'must

be sufficiently severe or pervasive to alter the conditions of the victim's employment and create

an abusive working environment.'" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147,

124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), quoting *Meritor Savings Bank*, 477 U.S. at 67. This

standard incorporates both objective and subjective elements. In *Harris v. Forklift Systems, Inc.*,

510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or
> abusive work environment—an environment that a reasonable person would find
> hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does
> not subjectively perceive the environment to be abusive, the conduct has not
> actually altered the conditions of the victim's employment, and there is no Title
> VII violation.

*Harris*, 510 U.S. at 21-22. The relevant inquiry cannot be reduced to "a mathematically precise

test." *Id.* at 22. In determining whether discriminatory harassment constitutes a violation of

Title VII, a trier of fact must consider whether the harassment is frequent or severe, whether it is

"physically threatening or humiliating," and whether it "unreasonably interferes with an

employee's work performance." *Id.* at 23.

Mitchell avers that the actions of Greener, Urbani and Potter in relation to her were

"pervasive and regular," "objectively unreasonable," and "personally offensive" to her. ECF No.

24 at ¶ 42. She alleges that the PSP is liable under Title VII for subjecting her to a "hostile work

environment." *Id.* In her brief, however, Mitchell does not distinguish this allegation from the

allegations pertaining to the specific personnel actions alleged to have been discriminatory. ECF

No. 41 at 19-21. Those actions, if discriminatory, constituted distinct "unlawful employment

practices." *Morgan*, 536 U.S. at 114. Mitchell cannot establish the existence of an actionable

"hostile work environment" by bootstrapping "discrete acts" of discrimination into a single claim. *Id.* at 113 (explaining that "discrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*")(emphasis added).

The remaining question is whether Mitchell can establish a violation of Title VII based on the manner in which she was treated by Greener, Urbani and Potter during the course of her training. This inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). As Mitchell stated in her memorandum to Manning, any cadet attempting to become a member of the PSP must be prepared to endure "stress, humiliation, and rigorous training." ECF No. 32-3 at 13. The inquiry into whether Mitchell's work environment was sufficiently abusive to violate Title VII must be viewed through that prism. *Oncale*, 523 U.S. at 81 ("A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.").

Even in the tough and demanding setting of a police academy designed to train future law enforcement officers, it is possible for a cadet's work environment to be sufficiently hostile or abusive to run afoul of Title VII. *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 329-336 (4th Cir. 2010). In this case, however, no reasonable jury could conclude that Mitchell was subjected to an *objectively* hostile training environment because of her sex. *Harris*, 510 U.S. at 21-22. The thirty-eight graduates interviewed by Karas did not believe that Greener, Urbani and Potter had been unfair to Mitchell. ECF No. 32-4 at 11-13. The isolated incidents described by Mitchell fall short of what is required to establish an actionable violation of Title VII. *McCloud*

*v. United Parcel Service, Inc.*, 543 F.Supp.2d 391, 399 (E.D.Pa. 2008). Summary judgment will be entered in favor of the PSP with respect to Mitchell's "hostile work environment" claims. ECF No. 24 at ¶ 42.

### c.    The Retaliation Claims

Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder. 42 U.S.C. § 2000e-3(a). In order for the "participation clause" to come into play, a charge of discrimination must be filed with the EEOC. *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 440 (W.D.Pa. 2010). Since Mitchell's charge of discrimination was not filed until after she had already been dismissed, her retaliation claims must be premised on Title VII's "opposition clause." *Id.* at 440-441.

In order to establish a violation of Title VII's anti-retaliation provision, Mitchell must show that: (1) she engaged in conduct entitled to statutory protection; (2) the PSP responded by taking a "materially adverse" action (or a series of "materially adverse" actions) against her; and (3) there was a causal connection between her statutorily-protected conduct and the PSP's "materially adverse" action (or series of "materially adverse" actions). *Estate of Oliva v. Dept. of Law & Public Safety*, 604 F.3d 788, 798 (3d Cir. 2010). In order for an employee's "opposition" to unlawful discrimination to be statutorily protected, the employee must act on the basis of an objectively reasonable belief that the "opposed" conduct actually violates Title VII. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). A retaliatory action is considered to be "materially adverse" to an employee if it might have dissuaded an objectively

52

reasonable employee from engaging in statutorily-protected conduct. *Burlington Northern &*
*Sante Fe Railway Co. v. White*, 548 U.S. 53, 67-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

In *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271,
277, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009), the Supreme Court explained that an individual
may "oppose" unlawful discrimination simply by refusing to assent to it. Speaking through
Justice Souter, the Supreme Court explained:

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where
> we would naturally use the word to speak of someone who has taken no action at
> all to advance a position beyond disclosing it. Countless people were known to
> "oppose" slavery before Emancipation, or are said to "oppose" capital punishment
> today, without writing public letters, taking to the streets, or resisting the
> government. And we would call it "opposition" if an employee took a stand
> against an employer's discriminatory practices not by "instigating" action, but by
> standing pat, say, by refusing to follow a supervisor's order to fire a junior worker
> for discriminatory reasons.

*Crawford*, 555 U.S. at 277. Under the broad standard enunciated in *Crawford*, Mitchell's
complaints to Andrews about the "gender discrimination and harassment" allegedly perpetrated
by Urbani and Potter clearly constituted "opposition" to sex-based discrimination. ECF No. 43-1
at ¶ 3. Even if the "opposed" conduct did not actually violate Title VII, a reasonable trier of fact
could conclude, on the basis of the existing record, that Mitchell believed that conduct to be
unlawful during the relevant period of time. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074,
1085 (3d Cir. 1996)(explaining that "protesting what an employee believes in good faith to be a
discriminatory practice is clearly protected conduct"). Furthermore, retaliatory actions
calculated to facilitate an employee's discharge would obviously dissuade an objectively
reasonable employee from engaging in protected conduct. *Johnson v. McGraw-Hill Companies*,
451 F.Supp.2d 681, 711 (W.D.Pa. 2006).

Andrews declared that he had directly relayed Mitchell's complaints to Potter and "counseled him to avoid any actions that could be construed as discriminatory or retaliatory." ECF No. 43-1 at ¶ 4. Mitchell testified that after her conversation with Andrews, Potter had prevented her from seeing Andrews for firearms-related training. ECF No. 32-9 at 28. She also stated that Potter had threatened to have her terminated if she were to report his alleged misconduct. *Id.* In her declaration, Mitchell asserted that Potter had communicated his threat "[w]ithin a day or two" of her discussion with Andrews. ECF No. 42 at ¶ 3. She also accused Potter of refusing to let her speak with Hocker about the situation. *Id.* The documentary record confirms that, on December 5, 2007, Potter charged Mitchell with an infraction for addressing a question to Andrews rather than to him. ECF No. 32-1 at 47. On the basis of this evidence, a reasonable jury could conclude that Potter charged Mitchell with infractions in retaliation for her complaints to Andrews. *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 232-233 (3d Cir. 2007); *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 178-179 (3d Cir. 1997). In light of Mitchell's testimony concerning Potter's alleged threat to have her terminated, a reasonable jury could also conclude that Potter acted with the specific intent to cause Mitchell's dismissal. *Staub*, 131 S.Ct. at 1194.

In her memorandum to Manning and supplemental memorandum to Karas, Mitchell claimed that she had been treated unfairly without specifically alleging that such mistreatment had been sex-based. ECF No. 32-3 at 10-13, 23-24. As explained earlier, the record contains no evidentiary support for a finding that the individuals named as defendants in the amended complaint retaliated against Mitchell for those allegations. *Breeden*, 532 U.S. at 272 (explaining that an employer need not suspend "previously planned" actions in response to an employee's protected activity). Because any retaliation claims based on Mitchell's communications to

Manning and Karas would nevertheless fail with respect to the issue of causation, there is no need for the Court to consider whether those communications, when viewed in the overall context of this case, could have reasonably been construed to express "opposition" to sex-based discrimination. *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135-137 (3d Cir. 2006). It suffices to say that Mitchell can establish the requisite causal connection only between her earlier complaints of sex-based discrimination and Potter's alleged acts of retaliation. The Defendants' motion for summary judgment will be denied with respect to Mitchell's claims under Title VII's anti-retaliation provision. ECF No. 24 at ¶¶ 40, 43-44.

## C.    The PHRA Claims

The provisions of the PHRA defining the term "unlawful discriminatory practice" are codified at 43 PA. STAT. § 955. The statutory provisions relevant to this case provide:

> **§ 955. Unlawful discriminatory practices**
> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . ., or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.
> \*\*\*
> (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.
> (e) For any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued

thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 PA. STAT. § 955(a), (d)-(e). Mitchell alleges that all defendants named in the amended complaint violated her rights under the PHRA. ECF No. 24 at ¶¶ 45-48. Her claims against Greener, Urbani and Potter are based on allegations of both sex-based discrimination and retaliation, while her claims against the remaining individual defendants are premised solely on a theory of retaliation. *Id.* at ¶ 46. The Court understands her PHRA claims against the PSP to be based on the actions of all seven individual defendants.

Pennsylvania's Sovereign Immunity Act [43 PA. STAT. § 8501 *et seq.*] shields "Commonwealth parties" from civil liability in most instances. 43 PA. STAT. §§ 8521-8522. The term "Commonwealth party" is defined broadly enough to include "any employee" of a "Commonwealth agency," "but only with respect to an act within the scope of his [or her] office or employment." 43 PA. STAT. § 8501. Discriminatory and retaliatory acts committed in the employment context are not among the categories of conduct for which the Sovereign Immunity Act has expressly waived the immunity from liability otherwise enjoyed by its instrumentalities and employees. 43 PA. STAT. § 8522(b). Nevertheless, the PHRA's definition of the term "employer" specifically "includes the Commonwealth or any political subdivision or board, department, commission or school district thereof . . . ." 43 PA. STAT. § 954(b). The Pennsylvania courts have construed the language of this definition to be a waiver of sovereign immunity in actions arising under the PHRA. *City of Philadelphia v. Pennsylvania Human Relations Commission*, 684 A.2d 204, 208 (Pa.Commw.Ct. 1996). For this reason, the Defendants are not immune from liability under Pennsylvania law for actions taken in violation of the PHRA's anti-discrimination and anti-retaliation provisions.

The Defendants argue that Mitchell's claims against the PSP are barred by the Eleventh Amendment. ECF No. 34 at 25. As noted earlier, Pennsylvania has not waived its Eleventh Amendment immunity. 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. § 8521(b). Although the PHRA waives Pennsylvania's immunity from actions brought in Pennsylvania courts, federal courts throughout the Commonwealth have consistently held that the applicable language of the PHRA does not operate as a waiver of Pennsylvania's Eleventh Amendment immunity. *Boone v. Pennsylvania Office of Vocational Rehabilitation*, 373 F.Supp.2d 484, 496 (M.D.Pa. 2005); *Dennison v. Pennsylvania Dept. of Corrections*, 268 F.Supp.2d 387, 405 (M.D.Pa. 2003); *Moore v. Pennsylvania Dept. of Military & Veterans Affairs*, 216 F.Supp.2d 446, 454 (E.D.Pa. 2002). Therefore, Mitchell's PHRA claims against the PSP are barred by the Eleventh Amendment, and this Court lacks jurisdiction to entertain them.[25] ECF No. 24 at ¶¶ 45-48.

The Eleventh Amendment does not immunize state officials who are sued in their personal capacities. *Hafer v. Melo*, 502 U.S. 21, 29-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Consequently, the PSP's Eleventh Amendment immunity cannot be invoked by the individual defendants to defeat Mitchell's PHRA claims against them. *Dennison*, 268 F.Supp.2d at 405. The merits of those claims must be considered.

The prohibitions contained in the PHRA are typically construed to be coextensive with those contained in Title VII. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). For this reason, the prior analysis relating to Mitchell's Title VII claims compels the conclusion that a genuine issue of material fact exists as to whether her parallel rights under the PHRA were

---

[25] A State waives its Eleventh Amendment immunity by removing a case from a state court to a federal court. *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 616-624, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). Had this action been commenced in a Pennsylvania court and removed to this Court, the PSP's removal decision would have constituted a waiver of its Eleventh Amendment immunity from Mitchell's PHRA claims. *Boone v. Pennsylvania Office of Vocational Rehabilitation*, 373 F.Supp.2d 484, 496 (M.D.Pa. 2005). The instant action, however, was originally commenced in this Court. ECF No. 1.

violated. The remaining issues center on Mitchell's ability (or inability) to proceed with her claims against particular individuals. Among the defendants in this action, only the PSP is amenable to suit under Title VII. *Kachmar*, 109 F.3d at 183-184. Since Mitchell's PHRA claims against the PSP are barred by the Eleventh Amendment, only her personal-capacity claims under § 955(e) remain at issue.

As the Court has already explained, Bonney and Karas were not involved in the decision to terminate Mitchell's employment. The record contains no evidence from which a reasonable trier of fact could infer that Miller, Manning, Greener or Urbani took actions against Mitchell for discriminatory or retaliatory reasons. Since Karas' IAD investigation uncovered no evidence of unlawful discrimination, Miller and Manning cannot be held liable for failing to remedy or deter such discrimination. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 553 (3d Cir. 1996)(holding that a supervisor who fails to stop known acts of discrimination may be held liable under the PHRA for "aiding or abetting" the discriminatory acts). Their decision to proceed with Mitchell's dismissal after the conclusion of the IAD investigation provides no basis for subjecting them to personal liability. *Curay-Cramer*, 450 F.3d at 137 (observing that "an employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in protected activity"). The record is devoid of evidence suggesting that Greener and Urbani knew about Mitchell's complaints to Andrews. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 505 (3d Cir. 1997)(recognizing that a retaliatory motive cannot be inferred where the record fails to establish a defendant's knowledge of the plaintiff's protected activity). Accordingly, the PHRA claims asserted against these six defendants must be dismissed. ECF No. 24 at ¶¶ 45-48.

It is undisputed that Mitchell complained to Andrews about sex-based discrimination allegedly perpetrated by Urbani and Potter. ECF No. 42 at ¶ 3; ECF No. 43-1 at ¶ 3. Andrews declared that he had spoken with Potter about Mitchell's complaints and "counseled him to avoid any actions that could be construed as discriminatory or retaliatory." ECF No. 43-1 at ¶ 4. Mitchell testified that Potter had threatened to have her terminated if she continued to report his alleged misconduct. ECF No. 32-9 at 28. She later declared that Potter had conveyed this threat to her "[w]ithin a day or two" of her conversation with Andrews. ECF No. 42 at ¶ 3. Mitchell also accused Potter of obstructing her access to Andrews and Hocker after learning of her complaints. ECF No. 32-9 at 28; ECF No. 42 at ¶ 3. She stated that Potter had told her "several times" that she would "not make it as a cadet" *because* she was a woman. *Id.* at ¶ 4. Potter charged Mitchell with multiple infractions during the course of her training. ECF No. 32-1 at 31-33, 41-47. One such infraction was charged because Mitchell had allegedly addressed a question to Andrews rather than to Potter. *Id.* at 47. For the reasons discussed earlier, a genuine issue of material fact exists as to whether Potter charged Mitchell with infractions for discriminatory or retaliatory reasons.

The applicable statutory language declares it to be an "unlawful discriminatory practice" for any *employee* "to attempt, directly or indirectly, to commit any act declared by [the PHRA] to be an unlawful discriminatory practice." 43 PA. STAT. § 955(e). If Potter's actions in relation to Mitchell were taken for discriminatory or retaliatory reasons, Mitchell can hold him personally liable for "his own discriminatory conduct." *O'Donnell v. Pennsylvania Dept. of Corrections*, 790 F.Supp.2d 289, 309 (M.D.Pa. 2011). The Defendants' motion for summary judgment will be denied with respect to Mitchell's PHRA claims against Potter. ECF No. 24 at ¶¶ 45-48. Mitchell will need to convince the trier of fact that Potter acted with a "discriminatory purpose

and intent" in order to hold him personally liable under the PHRA. *Holocheck v. Luzerne County Head Start, Inc.*, 385 F.Supp.2d 491, 497 (M.D.Pa. 2005). If she is unable to do so, she will not be able to hold the PSP liable under Title VII. *Staub*, 131 S.Ct. at 1191-1194; *McKenna*, 649 F.3d at 177-179.

## VI. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (*ECF No. 31*) will be granted with respect to all claims arising under the Constitution and the ADA, the Title VII claims based on a "hostile work environment" theory, and the PHRA claims against the PSP, Bonney, Karas, Miller, Manning, Greener and Urbani. ECF No. 24 at ¶¶ 32-38, 41-42, 45-48. The motion will be denied with respect to the discrimination and retaliation claims under Title VII and the PHRA claims against Potter. *Id.* at ¶¶ 39-40, 43-48. The caption will be amended to reflect the fact that Bonney, Karas, Miller, Manning, Greener and Urbani are no longer parties to this case. An appropriate order follows.

**AND NOW**, this 3rd day of August 2012, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendants (*ECF No. 31*), IT IS HEREBY ORDERED that the Motion is **GRANTED** with respect to all of the Plaintiff's claims under the United States Constitution and Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. § 12111 *et seq.*], her "hostile work environment" claims under Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*], and her claims under the Pennsylvania Human Relations Act [43 PA. STAT. § 951 *et seq.*] against Defendants Linda Bonney, Kenneth A. Karas, Jeffrey T. Miller, Rodney Manning, Mark W. Greener, Jason Urbani and the Pennsylvania State Police. The Motion is **DENIED** with respect to the Plaintiff's remaining discrimination and retaliation claims under Title VII and her claims under the Pennsylvania Human Relations Act against Defendant William Potter.   IT IS FURTHER ORDERED that Defendants Linda Bonney, Kenneth A. Karas, Jeffrey T. Miller, Rodney Manning, Mark W. Greener and Jason Urbani are hereby **DISMISSED** as parties to this case, and that the caption is hereby **AMENDED** to reflect the fact that only Defendants William Potter and the Pennsylvania State Police remain subject to the claims left to be tried.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

cc:   All counsel of record