IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE M. MITCHELL, | ) | |
| | ) | CIVIL ACTION NO. 3:10-129 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| WILLIAM POTTER and THE | ) | |
| PENNSYLVANIA STATE POLICE, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

## I. Introduction

This matter comes before the Court following a bench trial held on November 10, 2014, and November 12, 2014. The parties filed their proposed findings of fact and conclusions of law on February 25, 2015. (ECF Nos. 120 and 121). The matter is now ripe for disposition. For the reasons explained below, the Court denies Plaintiff's request for relief and enters judgment in favor of the Defendants.

## II. Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's PHRA state law claim pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## III. Procedural Background

This matter stems from Plaintiff's dismissal from the Pennsylvania State Police Academy (the **PSP Academy** or the **Academy**). On May 18, 2010, Plaintiff filed a complaint against a number of defendants, alleging various federal and state constitutional and statutory violations,

including discrimination and harassment on the basis of her sex. (ECF No. 1). On March 23, 2011, the Court granted Defendants' partial motion to dismiss, but gave Plaintiff leave to amend. (ECF No. 19). Plaintiff filed an amended complaint on May 16, 2011. (ECF No. 24). Plaintiff's amended complaint asserted the following claims: Count I asserted a claim against the individual defendants for violation of Plaintiff's First Amendment rights; Count II asserted a claim against various defendants for violation of Plaintiff's Fourteenth Amendment Equal Protection Rights on the basis of Plaintiff's sex; Count III asserted a claim against the Pennsylvania State Police for violation of Plaintiff's rights under Title VII and the Americans with Disabilities Act; Count IV asserted a claim against all of the defendants for violation of Plaintiff's rights under the Pennsylvania Human Relations Act (**PHRA**).

On August 3, 2012, this Court entered a memorandum opinion and order granting in part and denying in part Defendants' motion for summary judgment. (ECF No. 48). In that order, the Court dismissed several of the defendants and claims. At trial, the only remaining claims in the case were the discrimination and retaliation claims against PSP under Title VII and the claims against Defendant William Potter under the PHRA. (ECF No. 48 at 60).

On the basis of these alleged violations, Plaintiff seeks damages for loss of salary and benefits for 25 years and emotional distress.

IV.     **Legal Standard**

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court may enter judgment following a trial without a jury. *See* Fed. R. Civ. P. 52(a). In making a decision following a bench trial, "[t]he court must find the facts specially and state its conclusions of law separately." *Id.*; *see also In re Frescati Shipping Co., Ltd.*, 718 F. 3d 184, 196 (3d Cir. 2013).

Accordingly, the Court will discuss its factual findings and then proceed to its conclusions of law.

## V.      Findings of Fact

The Court makes findings of fact with regard to the remaining issues in this case: (1) whether Defendant PSP is liable to the Plaintiff for discrimination and retaliation under Title VII; and (2) whether Defendant William Potter is liable to the Plaintiff under the PHRA.

### A.      Factual background

The PSP Academy is a paramilitary stress academy. Tr. Vol. I at 182. The Academy is designed to ensure that those who come into the Academy want to be and are able to be troopers, and that they meet qualifications and performance standards. *Id*. The PSP Academy training process normally runs between 26 and 29 weeks. *Id*. at 181. Upon graduation, cadets have approximately one year of probationary trooper status. *Id*. at 181-82. Graduation from the Academy does not guarantee that a cadet will become a trooper. *Id*. at 182. After graduation, troopers still have FTO training during which they are assigned to two separate troopers for various weeks as coach/pupil. *Id*.

Academy standards are the same for male and female cadets; there is no differential in physical fitness, firearms qualifications, uniforms, or driving requirements. Tr. Vol. I at 186. The Academy trains everyone the same because a person that a police officer must deal with in a duty situation is not going to care how tall someone is or whether they are a female and cadets need to know how to function no matter what the circumstances turn out to be. Tr. Vol. II at 13.

### 1. Plaintiff's background at the Pennsylvania State Police Training Academy

Plaintiff Danielle M. Mitchell[1] graduated from Penn State University with bachelor's degrees in science and administration of justice. *Id.* at 71. She wanted to be a PSP officer and her stepfather was an active corporal in the PSP at the time of trial. *Id.* at 71-72. Mitchell enlisted in the PSP training program in October 2005. Tr. Vol. I at 72. She suffered a femoral head fracture from running a short time after enlisting. *Id.* at 72-73. She signed a conditional resignation and returned in January 2007 for the training class. *Id.* at 73-74. Mitchell then injured a muscle in her right groin during training events as a cadet and again signed a conditional resignation. *Id.* at 73-74. Mitchell reapplied and was admitted to the 125th training class. *Id.* at 74. When Mitchell started with the 125th class in June 2007, she had fully recovered from her prior injuries and felt that she was ready for training. *Id.* at 127. During the next six months of training as part of the 125th class, Mitchell had additional injuries, but nothing she could not work through and nothing that put her totally out of commission. *Id.* at 127.

The 125th Cadet Class trained in 2007 at the Southwest Training Center(**SWTC**) in Greensburg. *Id.* at 18. SWTC is a satellite location for training state police, and its primary function is to provide inservice training for local police officers and troopers that are already on the job. Tr. Vol. II at 4-5. The 125th class began at this location due to class size and space limitations at the Academy in Hershey, as the 123rd and 124th classes were both still in session at the time that the 125th class started. Tr. Vol. I at 191-92.

While at SWTC, the SWTC instructors dealt with the cadets on a day-to-day basis, but the Hershey Academy Staff, including Lieutenant Selgrath and Corporal Hocker monitored

---

[1] At the time of her initial enlistment, Mitchell's last name was Flenner. She apparently changed her last name after getting married.

reports that would come in, ensured the class was on schedule for completion of training by the scheduled date of graduation, and dealt with issues for equipment. *Id*. at 192-93. SWTC had a disciplinary officer assigned to it, but Corporal Hocker in Hershey was also the disciplinary officer for all cadets as part of his position. *Id*. Even though the class was at SWTC, this location did not have all of the needed facilities for training. Cadets would go to the Hershey Academy to finish out certain trainings that required these facilities which included training tank, patrol, rifle, and finishing up some firearms training. *Id*. at 194. The cadets of the 125th class went to Hershey on December 9, 2007, and spent the last two weeks of their training at Hershey prior to graduation. *Id*. at 196-97.

## 2. Defendant Potter

At the time of trial, Corporal William Potter had been with the state police for 21 years. Tr. Vol. II at 4. He was assigned to SWTC as an instructor from 2005-2013. *Id*. at 4. Potter was the platoon leader for the 125th cadet class at SWTC. Tr. Vol. II at 5. As the platoon leader, he was like a drill instructor for the class and was the face of the class. He led and coordinated activities for the class. *Id*. He did not live on campus, but generally worked from 8:00 a.m. to 4:00 p.m. on Mondays, Wednesdays, and Fridays. *Id*. at 5-6. When the class did physical training, he would come in and usually put in between 11 to 12 hour days. *Id*. at 6. Permanent staff like Potter did not work on weekends; they had field instructors that would work on the weekends and during the p.m. shifts. *Id*. at 6.

When the cadets came in, Potter would have told them that he would break them down as far as being individuals to get them out of the "all about me" mindset. Tr. Vol. II at 24. Throughout training, Potter typically says things like, "this isn't a democracy," "you don't have

a say-so here," "we tell you when to eat, how to eat" and how it's going to be. *Id*. at 9. Potter also used words and phrases such as "pathetic," "not committed," "resign," and "embarrassment." *Id*. at 23. He said things that were not popular, such as telling cadets that their effort was pathetic, or that if they're not going to put out or give the commitment, then they should leave. *Id*. Potter talked about commitment all of the time. *Id*. at 10. He explained that being a trooper is a lifetime commitment and emphasizes to cadets that even if they make it through training, they will still need to worry about keeping up their strength and officer safety. *Id*. at 10. Potter treats cadets the same during training—whether it be test scores, facilities, or pushups. Tr. Vol. II at 106-07.

Mitchell testified at trial that Potter told her that she was pathetic, the worst female he had ever seen, and a bad example of a female trooper. Tr. Vol. I at 122. She also testified that he told her he would break her down emotionally and physically and that she would not graduate. Tr. Vol. I at 122. Potter testified that he never said to Mitchell or any other female cadet that she could not do the job because she was a female or that she would not intimidate criminals. Tr. Vol. II at 24. Potter testified that he did convey to cadets that just because you are a female does not mean that someone will go easy on you. He testified that he gave cadets the tools that they need to eliminate the chance that a five-foot-two female might lose a battle against a six-foot-four person. He testified that they once showed a video of a woman being knocked out cold to make this point. *Id*. at 24-25. Potter testified that he never said to Mitchell or any other female cadet that she could not do the job because she was a female. *Id*.

Potter believes that women can do the job of a PSP trooper and has encouraged females that he trained in Liquor Enforcement classes to apply for the PSP. *Id*. at 13-14. Potter told

Mitchell that she did a good job in a fight situation when she delivered an elbow to another cadet. *Id*. at 26-27. He testified that he also told her that she did well with the PRISM system, which is a firearms simulator system. *Id*. at 27.

### 3. The training process at the Academy

The training process at the Academy centers on a theory of "motivation through consequences." Tr. Vol. I at 185. This theory deals with controlling behavior by consequences ("operant conditioning"), observational learning, and self-regulation. *Id*. For the first few weeks, behavior is corrected through push-ups, which help to attain the goals of physical fitness and teaching cadets not to engage in the behavior because of which pushups were ordered. *Id*.

After a couple of weeks, staff require cadets to write letters. *Id*. Instructors use these letters as a form of discipline to let cadets know that they violated a rule or committed an infraction, and that the behavior is something that the staff do not want to recur. Tr. Vol. I at 185-86; Tr. Vol. II at 14. The cadet writes what he or she did, why he or she did it, and why it will not happen again. *Id*. The letters also have a long-range purpose which is to teach cadets that report writing is an important part of being a trooper. Tr. Vol. I at 186. Typically, when an instructor requires a cadet to write a letter, they address the situation wherever it occurs and can request them in the open in front of everyone, including in the hallway or in the cafeteria. Tr. Vol. II at 15. Every cadet in the 125th class was required to write letters by many instructors, including Potter. Tr. Vol I at 146-48; Tr. Vol. II at 14-16. Potter testified that each cadet would have written a minimum of several letters. Tr. Vol. II at 15. After a cadet wrote a letter, he or she would turn it in. The letters went to their student leader, who would then turn in a group of letters in a stack to Potter, to the lead instructor for the day, or to whomever addressed them to

write the letters. Lastly, the letters would reach the secretary at the time, Ms. Demagone, who would return them to the mailbox of the officer who ordered the letter. *Id*. at 16. The instructor reviewed the letter to see if the information was correct and then initialed it. Tr. Vol. *Id*. 16-17. Instructors only reviewed letters that they ordered to be written; Potter testified that he would not review letters written to other instructors. *Id*. If there was something wrong in the letter, it would go back to the cadet for correction, which happened pretty frequently. *Id*. 17. Once finalized, the SWTC Secretary then sent the letters to Hershey. *Id*. at 17. Cadet letters to Potter and other instructors did not go to Sgt. Andrews for review before they got sent to Hershey. *Id*. at 17.

Cadets who failed two of the three run times during the week or had other infractions would be "restricted," meaning they would stay at SWTC for the weekend with details including cleaning the training center and clearing trails in the woods. *Id*. at 18-19. Potter never assigned Mitchell to perform a cleaning detail instead of performing morning physical training or exercise. *Id*. at 18-19, 88. Cadet Yachera, a female cadet, did not make the sit-up requirement on the first physical fitness test and was restricted to SWTC on weekends for six or seven weeks. *Id*. at 188. Cadet Yachera also had to write a letter and go to the gym for extra work on situps so that it would not be an issue on the next assessment. *Id*. at 188-89. Cadet Verbilla, a male, was restricted to SWTC and lost "about all" of his weekends because he missed/failed the run so many times. *Id*. at 231.Verbilla also had to write letters. *Id*.

Potter was involved in the morning runs, which were generally held on Monday, Wednesday, and Friday each week. *Id*. at 19. Potter was also involved in the morning medicine ball routines. *Id*. at 19. Troopers Urbani and Bernard were generally the lead instructors for the

runs and they set the pace for the run. Potter was one of many instructors that spanned out to account for the stronger runners and the weaker runners. Potter would float in-between, sometimes with the main group and sometimes toward the back group. *Id*. at 21. The morning run always ended with a final push up the hill from Route 30 to the top. *Id*. at 20-21. During runs, Potter yelled at cadets. Sometimes cadets would want to walk on the hills and at that point he would yell at them to tell them they cannot walk and to condition their minds that they are in that fight out in the field and if they feel like they are getting tired or starting to wear down, they cannot quit or walk. *Id*. at 22. When he yelled, he did not single people out. *Id*. If people were walking up the hill, they drew attention to themselves and were going to get talked to or yelled at. *Id*. at 22-23. Potter has made cadets, both male and female, drop and do pushups for walking up the hill. *Id*. at 23.

When a cadet developed an injury in the course of training and was medically unable to run, he or she had to perform alternate physical training while the rest of the class ran. *Id*. at 29-30. Initially, the alternate physical training for the 125th class included going to the gym and using stationary bikes or treadmills. *Id*. at 29-30. As the class progressed, however, Sgt. Andrews came out with the order that he did not want cadets to go to the gym as alternate training, but instead wanted them to do the medicine ball routine. *Id*. at 29-30. Andrews explained that he did not want people getting accustomed to not wanting to run and being able to use the treadmill or stationary bikes; he wanted everyone on the field and for the instructors to "PT them hard." *Id*. at 30.

Potter did the majority of the medicine ball routine training. *Id*. While the class was running, the injured cadets would do PT with Potter. He kept them doing PT until the run was

over because he figured it was only fair that while the class was running, the injured cadets would be doing something too. The medicine ball routine included several things such as lifting the ball above the head and touching the ground repeatedly, lunges, crunches, and squats, all without putting the ball down. This was a good full-body workout that elevated the heart rate and built stamina and strength. *Id*. at 31-32, 199. The medicine ball routine workout took place on the grass field area of the training center next to the parking lot (named "misery field" by the cadets). *Id*. at 31, 199.

### 4. The 125th Class

The 125th class arrived at SWTC in early June 2007 and training started immediately. *Id*. at 7. Instructors yelled at cadets as they got out of their cars and had them do pushups for wheeling luggage instead of carrying it. *Id*. at 7. Instructors at PSP tried to create an "in your face" environment to get people in the mindset that this is not college and that PSP's instructors control the environment. *Id*. at 8. After arrival, cadets were processed and brought into the classroom to go over the first night issues and policies. *Id*. at 8-9. Instructors discussed deportment, how to address instructors, standing at attention, and generally the life of a cadet. *Id*. at 9.

The 125th class started with approximately 60 members—54 males and 6 females. Tr. Vol. I at 183-84. This is a relatively small class for the Academy. *Id*. Approximately 20 cadets left within the first three weeks. *Id*. After the first three weeks, approximately 30% of the males in the 125th class had left; one of the six females had left. *Id*.

Ultimately, of approximately 40 total graduates, three females graduated from the 125th class at the graduation ceremony. *Id* at 184. Of the three that did not graduate, one left and one

was put on conditional resignation until she came back from injuries (and later graduated with another clas). The sixth female, Mitchell, was on holdover status. *Id*. Of the six females that entered the 125th class, four are still in the state police. *Id*. Of the original 54 males in the 125th class, about 38 or 39 graduated. *Id*. at 184-85.

Captain Manning, the Director of Training at the Academy, went to SWTC the first or second week of training to tell the 125th class what to expect and to make sure they saw a video of what a day in the life of a cadet is, which includes yelling, screaming, making beds, and running. *Id*. at 197. He reaffirmed to the cadets what they were going to experience, how instructors were going to be, and what would be expected of them. He told them that they would need to be accountable and responsible for their own actions as is expected of troopers. *Id*. at 197-98.

The 125th class had a 28-week schedule. *Id*. at 194. Because SWTC did not have all of the facilities needed for training, the class moved to the Hershey facility at times to finish certain training areas like patrol and rifle. *Id*. at 194. For example, during Week 11 (August 18, 2007-August 24, 2007), the class went to Hershey for a physical fitness assessment. *Id*. at 194-95; Def. Ex. 1. The class again went to Hershey for weeks 19 and 20 (roughly October 13, 2007-October 26, 2007) for driving training, clothing, patrol rifle training, and for another physical fitness assessment with Corporal Mory. Tr. Vol. I at 195; Def. Ex. 1. The class returned to the Academy at Hershey for the final two weeks of training—Weeks 27 and 28 (roughly December 8, 2007-December 21, 2007)—and remained there for graduation on December 21, 2007. Tr. Vol. I at 196-97; Def. Ex. 1.

The 125th class's final physical fitness assessment was with Corporal Mory at Hershey on December 11, 2007. Tr. Vol. I at 197; Def. Ex. 1. Certain of the cadets who had previous injuries, including Mitchell, were given an additional week and instead completed their final Physical Fitness Assessment on December 18, 2007. Tr. Vol. II at 191, 233; Def. Ex. 7, ¶ 6.

**B.** **The events surrounding the instant dispute**

This section includes the Court's findings of facts related to the events surrounding the instant dispute in five parts: (1) Mitchell's morning runs; (2) Mitchell's firearms training; (3) Mitchell's complaint to Sgt. Andrews; (4) Mitchell's infraction letters; and (5) Manning's decision to terminate Mitchell.

**1.** **Mitchell's morning runs**

The 125th class's first morning run was on June 25, 2007, a few weeks after the cadets arrived at SWTC. Tr. Vol. II at 37; Def. Ex. 3. Mitchell participated in and passed the time on the first run. Tr. Vol. II at 38; Def. Ex. 3. Mitchell participated in nearly every run over the next two months until a toe injury on August 15, 2007, but only passed the run time on one other occasion, on August 1, 2007. Tr. Vol. II at 38-42, 44; Def. Ex. 3. Mitchell testified that she passed three runs, but that Potter told her her time "wasn't legit" and that she failed it. Tr. Vol. I at 150. Mitchell was injured with a toe strain and unable to run in late August and early September 2007. During this time, she was permitted to ride the stationary bike instead of the morning run. Tr. Vol I at 128; Tr. Vol. II at 43-44; Def. Ex. 3. At about this time, Sgt. Andrews issued the order requiring injured cadets to do the morning medicine ball routine instead of using the gym as the their alternate physical training. Tr. Vol. II at 44-45. The only exceptions from injured cadets doing the morning medicine ball routine were cadets Wroble (female) and Holland (male), who

had to use the bike or treadmill for a period of time in November due to the nature of their injuries and doctor's restrictions (Wroble had injured her back and Holland had broken ribs). Tr. Vol. II at 51, 200. On September 10, 2007, Mitchell was declared medically cleared from her toe injury and returned to running that morning. She ran all of the morning runs over the next two weeks but never made the time. Tr. Vol. I at 129-30; Tr. Vol. II at 43-44; Def. Ex. 3.

The guidon is a flag that has the class number on it. The guidon is on a wooden post that the person chosen to lead the morning run carries to represent the class. If the person carrying the guidon does not pass the run that day, the entire class fails the time because no cadet is allowed to pass the person that carries the guidon during the run. Tr. Vol. II at 45-47, 185-86. In late September, on September 26 and 28, 2007, Mitchell led the morning run and carried the guidon. Tr. Vol. II at 45-46; Def. Ex. 3. Potter viewed running with the guidon as a way to motivate Mitchell to push herself. Mitchell led the morning run with the guidon two days in a row because she failed the first run. Tr. Vol. II at 86-87. The entire class failed because Mitchell failed when carrying the guidon. *Id*. at 46-47, 185-86. The class was not punished. *Id*. at 47. At one point during one of the runs during which Mitchell carried the guidon, Mitchell was struggling and there were shouts from cadets on the hill. *Id*. at 47-48; 186. Mitchell testified at trial that someone yelled at her to "[g]et moving fat ass" and "get moving, muffin" during a run when she carried the guidon. Mitchell testified that Potter was in earshot when these comments were made. Tr. Vol. I at 86-87. It was established at trial that while Mitchell carried the guidon, one of the male cadets yelled something like "get your fat ass up the hill." Tr. Vol. II at 48. One of the other instructors, Corporal Iwaniec, yelled right away for it to stop. *Id*. at 48, 118-19. There were times that Potter ran beside Mitchell and probably said things like, "you're pathetic" or

"you won't make it on the road," but he said these things to other cadets when he felt they were not putting forth effort. *Id*. at 48-49, 190. Mitchell was not the only cadet having trouble with the runs; there were many male cadets failing the time and Potter said the same things to them. *Id*. at 49, 190, 228.

On September 28, 2007, Mitchell had a hip strain and again did not run with the class. Tr. Vol. I at 129-30; Tr. Vol. II at 49-50. Two months later, on November 28, 2007, Mitchell had a neck and back strain from wrestling. Tr. Vol. I at 130. On December 3, 2007, Mitchell was released to run on hard surfaces. Tr. Vol. I at 130. Other cadets suffered injuries and missed morning runs, including Cadet Wroble (female), who tore a calf muscle and missed five weeks, and Cadet Verbilla, who had shin splints and an injured left knee, as well as Cadet Verbeck and possibly Cadet Coda. Tr. Vol. II at 200-01. Anyone who was injured had to do the medicine ball routine. *Id*. According to Trooper Tonya Wroble, the medicine ball routine was probably a more strenuous workout than the run. *Id*. at 199. Cadets were encouraged, especially if they were struggling, to work out in the gym, using the treadmill, stationary bikes, or weights, after hours during their free time, after supper, or in the evenings and on weekends. *Id*. at 32, 78, 187. Cadet Wroble (female) missed many morning runs because of an injury, but did whatever she could do to keep in shape without furthering her injury, including pushups and situps in her room; when Cadet Wroble took the final physical fitness test on December 18, 2007, she passed. *Id*. at 201-02. Likewise, Cadet Verbilla took advantage of alternate physical training like medicine ball routines, flutter kicks, and anything to get the heart rate increased. *Id*. at 229. He rode the bike and when he started getting healthier he ran outside on his own time to get back in shape. He also ran on the treadmill. *Id*. at 229.

Mitchell testified at trial that Potter did not allow her to have remedial training in exercising. Tr. Vol. I at 80-84. Potter testified that he never told Mitchell that she could not work out in the gym or run on her own after hours or on weekends and he never restricted her from the gym. Tr. Vol. II at 32-33, 78-8. The evidence presented at trial established that Mitchell used the gym in November. Tr. Vol. II at 34-36; Def. Ex. 14. When Mitchell and another injured cadet (Verbilla, a male) wanted to run on the grass or do something other than the medicine ball routine, Potter told them that Sgt. Andrews' orders required them to do the medicine ball routine, but that they were allowed to sign out and do other exercises on their own time. Tr. Vol. II at 33-34; Pl. Ex. 14 at 34 of 43.

Mitchell and several other cadets were given an extra week for physical rehab to perform the final physical fitness test and took the test on December 18, 2007, while the rest of the class took the test on December 11, 2007. Tr. Vol. I at 219-21, 233. The doctor had cleared Mitchell for this test. *Id*. at 233. Mitchell failed the 300-meter run test during the final physical fitness test that Mitchell took on December 18, 2007 in Hershey by seven seconds (she ran 63 seconds instead of 56). *Id*. at 100-01, 190-91; Def. Ex. 6 at Tab 31. Another male cadet failed the test as well; he also did not graduate. Tr. Vol. I at 100-01. Many cadets, including Wroble and Holland, were injured throughout the training, had to do the medicine ball in the morning, and missed morning runs like Mitchell did, but passed the final physical test and graduated. Tr. Vol. II at 69-70.

### 2. Mitchell's firearms training

Firearms training is a part of the basic cadet class at PSP Academy training. Tr. Vol. II at 119. Corporal Jason Urbani was the primary firearms instructor at SWTC when Mitchell was

there as part of the 125th class. *Id*. at 115. Cadets arriving at the Academy possess different levels of firearms proficiency ranging from those who have never handled a gun before up to a high degree of proficiency. *Id*. at 120. Ultimately, cadets have to qualify on a basic pistol course but receive approximately 12 hours of classroom instruction in addition to pistol training in preparation for the qualifying course. *Id*. at 120-22. Initially, there is classroom instruction of approximately six or more two-hour sessions before the cadets go out to the range to fire for the first time. *Id*. at 121. During these classroom sessions, instructors cover basic firearms safety as well as care and cleaning of weapons. Instructors teach basic marksmanship principles like stance, grip, sight alignment, and sight picture. In addition, as part of the classroom instruction, cadets are issued leather gear and taught how to draw the pistol from the holster, how to grip the weapon, and how to acquire the sight. "Dry firing" is also covered, which is firing the weapon without ammunition so cadets can get a feel for the grip, the trigger squeeze, and resetting the pistol. *Id*. at 121-22.

Once on the range, cadets start by firing one round at a time, usually at the seven yard range. This gets the cadets used to drawing their weapons, firing a round, hearing it go off, feeling the recoil, seeing where their rounds are going, and getting an idea from a bullseye perspective of how to get the middle of the target. *Id*. at 123. The "bulls eye session" consists of firing anywhere from 470-500 rounds per cadet and occurs before the cadets even get on to the qualification course. *Id*. at 123-24.

After the bullseye session, the cadets and instructors have another classroom session during which they talk about combat shooting and look at a silhouette target, which is the target used for qualification in firearms. *Id*. at 127. This combat shooting instruction includes

talking about different types of stances, shooting "double taps," which are rounds in rapid succession, and introducing time constraints such as firing four rounds in six seconds. *Id*. at 127. Cadets then return to the range where they get practice on these concepts before their qualifying rounds. *Id*. The instructors break the course down into sections, from as far away as the 25-yard line up to the 3-yard line, and have the cadets shoot multiple rounds from all positions. Each session incorporates portions of what eventually becomes the cadets' qualifying course *Id*. at 128. Cadets fire upwards of 700-750 rounds during this training. *Id*. at 128.

On the qualifying course, cadets start at the 25-yard barricade position and shoot five rounds at the silhouette target using a "strong hands" two-handed grip, keeping most of their bodies behind cover. They reload their weapons with another five round magazine, switch to their off hands, and fire at the 25-yard silhouette with a two-handed grip. *Id*. at 129. Cadets then reload their weapons and prepare for the rest of the qualification course. This entails moving up and firing from the 3-yard line, back to the 15-yard line. *Id*. at 129. The entire qualifying course consists of 60 rounds with a maximum of five points per round (with the center of the target being worth five points, outside of that being four points, and the rest of the silhouette being worth one point). The maximum a cadet can score is 300 points. A score of 225 is needed to qualify. *Id*. at 129.

Prior to firing the actual qualifying course, cadets did a full practice run through the qualifying course, which was scored so that they and the instructors could see where the cadets stood. This practice run was treated as though it were the real thing, but it was just a practice run which did not count toward graduation. After this practice run, Urbani and Copechal reviewed the scores. These scores did not count toward graduation, but showed the instructors

and the cadets where they stood. Tr. Vol. II at 130. The purpose of reviewing the scores was to see who was having problems, who was close to making the qualification round, and who was having trouble even attaining anything close to the minimum score. For those cadets who were identified as having problems, the instructors would typically speak to them about what their deficiencies were, where they needed to improve for their own individual shooting, and usually discussed problems that had been reviewed with that particular cadet throughout training. Instructors would try to help those cadets so that they could do better. *Id*. at 130-32.

There is a separate range called the "stress course" range. This course involved all of the firearms training that the cadets had received on pistols and long guns. Cadets then utilized their skills on transitioning from one weapon to another, tactical reloads, jam clearings, and the entire gamut of firearms experiences that they might encounter in the field when serving as troopers. *Id*. at 140. Stress is induced by "amping them up" by yelling at them and imposing time constraints. *Id*. at 140.

Corporal Urbani observed Mitchell's performance on the bulls eye range. Mitchell was "flinching," meaning she was anticipating the shot going off. When this occurs, the front of the pistol dips and the rounds hit low. *Id*. at 124-25. Urbani also saw that Mitchell was having difficulty manipulating the weapon. *Id*. at 124. While Mitchell adequately acquired her grip taking the weapon out of the holster, she was not removing the pistol from the holster quickly enough. *Id*. at 125. Urbani recognized Mitchell's deficiencies on the bulls eye range and immediately addressed them with her and offered feedback on how to remedy them. Tr. Vol. II at 125-26. Urbani and Corporal Copechal, who was also on the range, would stand behind any cadet having problems and speak to them about what they needed to do to hit the target. *Id*. at

125. To help Mitchell, Urbani and Copechal stood behind her numerous times and reminded her to simply think of "right front squeeze" as she fired. When shooters do that, many times it stops the flinching problem. *Id*. at 126. Urbani's and Copechal's efforts to help Mitchell worked as long as they were standing behind her giving verbal instruction. As soon as they left, Mitchell's same exact problems would return. *Id*. at 126.

Mitchell "failed" the practice round on the qualifying course meaning that she did not get 225 points which would have constituted failure had this been the real qualification round. *Id*. at 130-31. September 25, 2007 was the first actual qualifying run for members of the 125th class. Mitchell failed on this run with a score of 204 out of 300. Two other cadets failed that attempt, Cadets Stein and Wroble. *Id*. at 132-33; Def. Ex. 2. Mitchell and the two other cadets who had failed ran through the qualifying course a second time on September 25, 2007. Prior to the second attempt, Urbani and Copechal identified the cadets who did not pass, including Mitchell, and explained deficiencies and how to make corrections. *Id*. at 133. Mitchell failed to qualify on this second attempt with a score of 196 out of 300. *Id*. at 134; Def. Ex. 2. On September 29, 2007, Mitchell was given a third attempt at qualifying on the qualifying course. The people on the qualifying range for this third attempt were Mitchell, Urbani, and Copechal. Mitchell failed this third attempt with a score of 221 out of 225. *Id*. at 134-35; Def. Ex. 2.

After this third failure, Mitchell was advised that she had to do more dry firing and holster draw practice in her room at night on her own. Urbani and Copechal also took Mitchell to the live range two times on October 10 and 11, 2007 for a total of two hours of practice, to have her fire live rounds on the qualification course. Tr. Vol. II at 135-36; Def. Ex. 6 at Tab 23, ¶ 3. In addition, Potter and Urbani set up the qualification course in the PRISM system and

worked with Mitchell in the PRISM room. Tr. Vol. II at 27-28, 136. Urbani, Copechal, and Potter placed Mitchell on the PRISM system five or six times prior to October 12, 2007. Tr. Vol. II at 136; Def. Ex. 6 at Tab 23, ¶ 3.

Mitchell attempted the qualifying course again on October 12, 2007. She went to the range with Urbani and Copechal. Mitchell failed to qualify on this fourth attempt. Tr. Vol. II at 137; Def. Ex. 2; Def. Ex. 6 at Tab 23, ¶ 3. This fourth attempt was Mitchell's final attempt at SWTC, as an order came from the Training Academy in Hershey stating that any further qualification attempts for Mitchell would take place in Hershey after she had received additional training in Hershey. Tr. Vol. II at 139. Mitchell testified at trial that she was "not given the same opportunities to have remediation firearms." Tr. Vol. I at 80. Urbani testified that no cadet was allowed to take a weapon home or go offsite with his or her weapon. The cadets could not go out and shoot with them and did not have access to ammunition and were not allowed to go on the range by themselves. Urbani explained to Mitchell that they had to reserve time on the range before using it and could not just go down there any time they wanted. Urbani also testified, however, that it is always up to the cadets if they want to shoot on their own with a private firearm at home as long as they understand that this would be under someone else's instruction. This would be fine and Urbani stated that there was nothing he could do to stop them from doing that to become proficient. *Id*. at 138. Compared to other cadets in the 125th class, Mitchell received "a lot" more individualized firearm training than anyone else. *Id*. at 139-40. Mitchell made the minimum standard and passed on her fifth attempt to qualify with her firearm. Tr. Vol. I at 204.

Urbani also worked with Mitchell on the "stress course" range. Mitchell performed poorly on this course. She had trouble with engaging threats, accuracy, transitioning, and tactical reloads from cover. Tr. Vol. II at 141; Def. Ex. 6 at Tab 23, ¶¶ 4-6. One time while on the stress course, Mitchell ran out of ammunition. When confronted with the fact that she had run out of ammunition, Mitchell responded, "I'm dead." Tr. Vol. II at 141-42; Def. Ex. 6 at Tab 23, ¶ 6. Mitchell took part in a "tactical handgun range," which involved shooting on the move, with the same poor results including running out of ammunition. Tr. Vol. I at 150-51; Def. Ex. 6 at Tab 26. Mitchell had to write more than 60 letters concerning firearms issues to Copechal and Urbani. Tr. Vol. II at 142; Def. Ex. 6 at Tab 26.

Andrews gave Mitchell additional training on the PRISM firearms system. Tr. Vol. I at 24. When Sgt. Andrews had Mitchell do PRISM training, Potter and Urbani confronted Andrews. Andrews testified that Potter was extremely upset with Andrews for providing remedial training to Mitchell. Tr. Vol. I at 26. Potter and Urbani were concerned about lack of consistency because Andrews was having Mitchell do this training without the firearms instructors. Urbani and Potter were also concerned about Andrews fostering a mentality or atmosphere of "Sgt. Andrews and Ms. Mitchell against us [the instructors]." Tr. Vol. II at 95-96.

Mitchell's firearms instruction took place at the Academy in Hershey, Pennsylvania on October 20 and 21, 2007, with Corporal John Stover teaching the cadets of the 125th class patrol rifle firing with the AR-15 weapon. Tr. Vol. II at 164-65; Def. Ex. 6 at Tab 22. The morning of October 20th consisted of classroom instruction on how to operate different components of the weapon, the charging handle, the magazine release, the selector switch, and the forward assist. Tr. Vol. II at 165-66; Def. Ex. 6 at Tab 22. Mitchell was one of the cadets who received this

classroom training. Tr. Vol. II at 166. Later that morning, to end the classroom instruction, Corporal Young went over the actual loading of the weapon, charging the weapon from a cruiser-safe position or from an empty position. This training took place on the range on the fire line prior to the cadets firing their weapons. *Id*. at 166-67. Cadets were also taught the proper method of clearing a jam. Live fire followed this instruction. *Id*. at 166-67; Def. Ex. 6 at Tab 22, ¶ 2.

Stover observed Mitchell on the live fire range. She did not perform well. Tr. Vol. II at 167; Def. Ex. 6 at Tab 22. Mitchell failed to follow the instructions that had been given in the classroom and on the range prior to firing. She was not operating certain components of the rifle with the correct hand as she had been instructed. Tr. Vol. II at 167. Stover repeatedly told Mitchell about the errors she was making. He would stop, interject, explain, and tell Mitchell how to do it properly. Mitchell continued to make the same mistakes time and time again. *Id*. at 168. In total, Stover corrected Mitchell 11 times on October 20, 2007. *Id*. at 168.

Rifle training continued the next day on October 21, 2007, when the class progressed to more advanced drills and qualification. *Id*. at 168. Mitchell was present for this training. *Id*. The training began with a safety circle drill. The command was given to the cadets to clear their weapons and assume the safety circle drill. The drill required the cadets to make sure that their weapons were clear. Stover observed Mitchell during this drill. Stover noticed that despite the fact that the patrol rifle was supposed to be cleared and empty, Mitchell had a magazine in the magazine well of her weapon. When Stover noticed the magazine, he told her to clear the weapon. When Mitchell cleared her weapon, it turned out that there actually had been a live round in the chamber as well. When asked why she had a magazine in the magazine well,

Mitchell said that she observed another cadet with a magazine in his magazine well so assumed that this command had been given. Mitchell and the other cadet were ordered to write letters related to this series of events for Stover. *Id*. at 168-71; Def. Ex. 6 at Tab 22, ¶ 4.

As the day progressed, part of the patrol rifle training consisted of transitioning from the rifle to a pistol. The cadet fires all the rounds from the rifle and then transitions to the pistol, emptying that weapon as well. Tr. Vol. II at 171-72; Def. Ex. 6, Tab 22, ¶ 5. Mitchell was unable to clear her pistol at the end of the drill. Mitchell then brought the pistol up over cross her body, pointed it up to the left and was using the hand that was holding the rifle such that the muzzle of the pistol was pointed down the line of fire of cadets, essentially at the cadet directly beside Mitchell. Tr .Vol. II at 173; Def. Ex. 6 at Tab 22, ¶ 5. Stover yelled at Mitchell to point her pistol downrange. She eventually cleared and holstered her pistol. Stover took her rifle, cleared it, and ordered her off of the range. Tr. Vol II at 173; Def. Ex. 6 at Tab 22, ¶ 5. As of October 21, 2007, Stover had been a firearms instructor for approximately four years in the field and had never ordered anyone off of the range prior to this incident. At the time of trial in November 2014, Stover had never ordered anyone off of the range since this incident. Tr. Vol. II at 173. Mitchell did not follow procedures on the range on October 20 and 21, 2007 and the consequences were that she put everyone, including all of the instructors and shooters, in danger. *Id*. at 174. Mitchell needed virtually one-on-one supervision on October 20-21, 2007, and could not act independently on the range. An instructor was with her at all times for safety purposes. *Id*.; Def. Ex. 6 at Tab 22, ¶ 6.

### 3. Mitchell's complaint to Sgt. Andrews

Mitchell came to Sgt. Andrews' office in early December 2007 complaining that she felt she was being singled out by Potter because of her gender. Tr. Vol. I at 20-22. Mitchell testified that she went to Andrews to complain about gender discrimination and lack of remedial training for firearms. *Id*. at 88-93. Andrews understood that one of the issues Mitchell complained about involved Potter not allowing Mitchell to take part in the building search exercise. *Id*. at 48. Andrews understood that Potter did not want Mitchell to take part in the building clearing exercise because she had not attended the class that prepared her for the practical exercise. *Id*. at 48. When explaining the specific discriminatory treatment that she shared with Andrews, Mitchell testified that she told Andrews, "we're to the point in training that I'm being singled out and no one else. I shouldn't say no one else, but it was just a lesser level, and [Potter] actually told me I'm pathetic." *Id*. at 89. At trial, Mitchell testified that Potter told her if he couldn't break her down emotionally, he would break her down physically. *Id*. at 80. Mitchell testified that she "felt it was because of [her] sex" that Potter said these things. *Id*.

According to Andrews, Mitchell said nothing during this meeting that he viewed as sexual discrimination. This is why he did not make a complaint. *Id*. at 63-64. Andrews had worked for 3.5 years as an investigator with PSP's Internal Affairs Division (IAD), which conducts investigations against PSP members, and he had experience with investigations for sexual harassment claims. *Id*. at 56-57, 67. If Andrews thought there was a genuine sexual discrimination complaint being made by Mitchell, he would have issued a worksheet on it. *Id*. at 65-66. Andrews did not believe what Mitchell told him rose to the level of requiring him to issue an IAD worksheet or to the level of requiring him to contact the Equal Employment

Opportunity (EEO) Office. *Id*. at 57, 58, 62. He also did not feel the need to report what Mitchell told him to Lt. Jobin, who was his regional training center director, or to the Academy in Hershey. *Id*. at 58. Andrews also did not mention his conversation with Mitchell to Karas who interviewed him in March 2008 as part of the IAD investigation that was triggered by Mitchell's December 21, 2007 letter to Manning. *Id*. at 59-60; Pl. Ex. 14 at 27 of 43. Andrews recalls his conversation with Mitchell as supportive. Tr. Vol. I at 62. He explained that there were male police officers who did not believe females should be police officers, but that it was up to Mitchell to be strong and to persevere through. *Id*. at 22-23. Andrews did not mention Potter as one of the officers who are reluctant to accept female officers. *Id*. at 23. Andrews had observed Potter and the other instructors engaged in training cadets of the 125th class daily. He saw Potter and others yell at women, men, African Americans, and Caucasians. *Id*. at 48-50. Andrews saw Potter being consistent with everyone; he did not see him single out a person because of his or her color or gender. That is why Andrews did not view Mitchell's concerns as a sexual harassment case or complaint. *Id*. at 62. Andrews never saw evidence of discriminatory behavior on Potter's part. *Id*. at 47.

Andrews told Potter about the meeting and what Mitchell's concerns were. He said to avoid any actions that could be perceived as being discriminatory in nature. *Id*. at 25. Andrews would not consider this conversation with Potter to be "counseling." *Id*. at 25, 63. Potter did not recall this conversation but testified that he agreed that all gender discrimination complaints should be submitted to the EEOC unit; he had no explanation as to why this was not done in this case. Tr. Vol. II at 100-02.

### 4. Mitchell's infraction letters

Mitchell had to write dozens of letters to many instructors, including Troopers Bernard and Urbani, for missing morning runs or not making the times. Tr. Vol. I at 148-49; Def. Ex. 6 at Tabs 27 and 28. Many other cadets had to write similar letters. Tr. Vol. I at 149. Mitchell wrote more than 60 letters concerning firearms issues to Copechal and Urbani. *Id*. at 150-51; Def. Ex. 6 at Tab 26. Of the infraction letters in the ADO Report, Potter only had Mitchell write four—one in August 2007 for lying about the number of pushups she had done, two on October 31, 2007 for uniform and inspection violations, and the last on December 5, 2007 for not following chain of command. Tr. Vol. II at 53-63; Def. Ex. 6 at Tabs 11, 16-18.

Mitchell testified that Potter yelled at her and made her write a memo about not going outside of the chain of command as a result of her meeting with Andrews. Tr. Vol. I at 94-95; Pl. Ex. 12. On December 3, 2007, Mitchell went to Sgt. Andrews rather than Potter or other instructors as the chain of command required her to do, to ask about attending class. Mitchell had scheduled a doctor appointment for the time period of a classroom instruction that preceded a building search exercise. Potter explained that Mitchell and another cadet, Roberts, could not attend the building search exercise because they had missed the classroom session that was necessary to teach the practical skills needed for the exercise. When Potter learned that Mitchell went to Andrews to ask about this, he had her write a letter for violating the chain of command. Potter testified that he had already explained to Mitchell why she could not attend the exercise and that his decision to keep her from participating had nothing to do with gender discrimination or targeting her as a female. Tr. Vol. II at 59-63, 96-98; Def. Ex. 6 at Tab 18. Potter did not tell Mitchell that she could not talk to the ADO or complain about gender

discrimination; it would not be a chain of command violation if a cadet bypassed Potter to make such a complaint. Tr. Vol. II at 64.

December 5, 2007 was a Wednesday. The class finished training at SWTC a few days later and left for Hershey to complete their final two weeks of training. *Id.* at 65-66; Def. Ex. 1. Potter did not go with the class to Hershey. He would have travelled to Harrisburg on December 18, 2007 for the Commissioner's inspection. Tr. Vol. II at 66-67; Def. Ex. 1. Potter only learned that Mitchell was not graduating at the banquet on Dec. 20, 2007. He learned that a male cadet, Roberts, was also not graduating at this time. Tr. Vol. II at 68.

### 5. Manning's decision to terminate Mitchell

As Director of Training, Captain Manning ultimately makes the decision on whether a cadet graduates from the Academy. Tr. Vol. I at 186-88. Typically, when a cadet class has people who may fail, Lt. Selgrath and Sgt. Hess would make Manning aware of the situation. Before Manning takes the next step (requesting an inquiry and report from the Academy Disciplinary Officer or ADO), Manning would want to know whether they had done everything they could as far as training and with respect to the particular deficiency. If Manning is satisfied that everything possible has been done, he asks for the ADO inquiry. *Id.* at 187-88, 198. The decision to request an ADO inquiry does not happen often. Manning did this approximately eight to ten times during his career as Director. *Id.* at 203. Because the decision to start the ADO inquiry comes at a point where the Academy staff have exhausted other measures, cadets with an ADO inquiry usually end up being terminated. *Id.* at 203-04.

At the end of October 2007, when the 125th class was at the Academy in Hershey, Manning went through this same process for requesting an ADO process in the case of Mitchell

and a male cadet, Cadet Roberts (both of whom had been identified as struggling or failing). *Id.* at 198-99. Mitchell's firearms problems and concerns with competency, particularly the range safety episodes being reported by Stover, the firearms instructor at Hershey, probably triggered Selgrath to go to Manning about Mitchell. *Id.* at 261-62; Def. Ex. 6 at Tab 22. When an ADO report is requested, the cadet would know about it and would know that the likely outcome would be termination. Tr. Vol. I at 262. Manning was made aware of Mitchell's problems, chiefly with physical fitness and firearms, and after determining that everything had been done to help her succeed, he requested an ADO inquiry. Tr. Vol. I at 203. At that point, he did not know how many infractions or letters Mitchell had accumulated. *Id.* Potter was not a part of the decision to proceed with an ADO inquiry. *Id.* at 201. Manning believes that by late October, he was aware that Mitchell required five attempts to qualify with her firearm, which is why he knew that use of firearms was an issue for her. *Id.* at 204-05. Manning had additional concerns, not only with the number of attempts and how close she was to the minimum standard, but also with the fact that her attempts were all in a disciplined, restricted environment with plenty of opportunity to shoot and practice. Such an environment no longer exists after graduation. *Id.* at 205.

Mitchell learned that she was being considered for dismissal or not graduating around October 27, 2007. *Id.* at 261-62. Mitchell recalled being called in to talk to Selgrath while the class was at Hershey after the incident on the range described by Stover in his October 23, 2007 memo. She was told she was incompetent and not "made to be there." Tr. Vol. I at 163-64. Potter was not at this meeting. *Id.* at 164. As of December 5, 2007, the day Potter had Mitchell write the chain of command letter, Potter was unaware that Manning had ordered an ADO inquiry for

Mitchell in October 2007. Tr. Vol. II at 65; Def. Ex. 6 at Tab 18. Potter did not provide input or participate in discussions with Manning or Selgrath about Mitchell not graduating. Tr. Vol. II at 68.

After the Captain requests the ADO inquiry, the ADO (Corporal Hocker) collects everything related to the cadet's training so that the Captain has a picture of the person, what has gone on, letters, what he or she failed, what he or she passed, how close the score was to the minimum for passing, and grade average. Tr. Vol. I at 200, 205. In this instance, Hocker, the ADO, began pulling this information for Mitchell and the other cadet who was identified as struggling or failing (a male). *Id*. at 205.

There are certain factors which result in automatic termination, including failing the physical fitness standards, failing to maintain a certain grade point average, and failing firearms tests. *Id.* at 188. In 2007, the physical fitness standards consisted of the 300-meter run, sit-ups, pushups, vertical jump, and the 1 ½ mile run. *Id*. at 189-90; Def. Ex. 6 at Tab 31. Thus, Mitchell's failure on the 300-meter run constituted automatic termination because the required time of 56 seconds was a minimum standard. Tr. Vol. I at 191. Manning has dismissed other cadets, including a male, for failing to meet the minimum physical test standards, including the 300-meter or 1 ½ mile run. *Id*. Hocker gathered the information relating to Mitchell's training and provided it to Manning in his ADO Report dated February 19, 2007. *Id*. at 205; Def. Ex. 6. Mitchell's physical fitness test scores from December 18, 2007 were the last piece of information attached to the report. Def. Ex. 6 at Tab 31. Manning met with Mitchell on December 20, 2007 in his office at the Academy in Hershey. Tr. Vol. I at 206-07. Manning would have reviewed the ADO Report before meeting with Mitchell on December 20, 2007. *Id*. at 205-06. He would have

laid out the facts of the case and what they had as far as a record of Mitchell's training. The review usually starts out with infractions to show a pattern of behavior and then covers the actual training behavior. In Mitchell's case, it was firearms and physical fitness that he explained to Mitchell. The word "incompetency" is used and means a failure to maintain the minimums required for graduation. Manning then gives the cadet a piece of paper and explains this is his or her right to mitigate in the ADO process and to give him something that tells him he should keep this cadet rather than terminating him or her. *Id*. at 207. Manning had an idea about what he intended to do in Mitchell's case based on the ADO report but gave her an opportunity at this meeting to put forth mitigating circumstances of which he was not aware. *Id*. at 206. He gave Mitchell 24 hours to prepare a written statement of mitigating circumstances. *Id*. at 207. Manning received her letter the next day. *Id*. at 208, 210-11. In the letter, Mitchell referenced Potter's conduct as support for her claims of gender discrimination. *Id*. at 99-103; Pl. Ex. 3. Due to her raising issues with the severity of the training in her letter, he conferred with the Major and issued a worksheet so that Internal Affairs could conduct an investigation into her complaint. *Id*. at 208, 210-11.

With the investigation into Mitchell's complaints ongoing, Manning looked at all of the data and paperwork Hocker provided with the ADO Report, which included Mitchell's issues with firearms and physical fitness. *Id*. at 211-12. Manning then made his determination and issued a recommendation for Mitchell's dismissal on January 3, 2008. Potter testified that he understood that graduation requirements used an objective standard. Tr. Vol. II at 104. Manning's testimony was that he based his decision on the totality of the circumstances. Tr. Vol. I at 245.

Mitchell's firearms problems (safety on the range and requiring five attempts to qualify) weighed heavily in the Captain's determination. *Id*. at 212. It wasn't only the five attempts; rather, Manning also looked at all of the hours that went into the fifth attempt to qualify—all of the practice, ammunition—and with all of that, Mitchell still only passed with a minimum score. *Id*. at 212. Manning was concerned about how Mitchell would perform in the field without the same resources. *Id*. at 212-13. Manning also looked at Mitchell's physical fitness issues. Her failure to meet the minimum standards would normally be automatic termination. In addition, he had information that Mitchell missed at least 30 runs and was concerned about whether she had the discipline needed to maintain physical fitness in the field. *Id*. at 213.

Manning also looked at Mitchell's infractions, which revealed a tendency to blame others rather than accept responsibility. *Id*. at 213. This concerned Manning because troopers have to react and act during stressful times, during which a cadet's emotional intelligence comes into play. Manning needs to see that the individual is accountable and responsible. Manning did not see these things in Mitchell's case. *Id*. at 214. Manning believed on this basis that she would not have made it through field training. *Id*. at 213. Potter required Mitchell to write four of her many infraction letters attached to the ADO report. Def. Ex. 6 at Tabs 11, 16, 17, and 18. Manning did not consider the issues in these letters to be serious violations. Tr. Vol. I at 217-19. Manning's dismissal recommendation would not have changed if these four letters had not been included in the ADO report. *Id*. at 219. Mitchell's infractions in general did not constitute a major factor in Manning's decision to recommend Mitchell's dismissal. *Id*. at 214. Infraction levels are like "system corrections" to make sure PSP is following its own rules and

regulations. They do not tell Manning how a trooper is doing as far as safety or whether he or she is qualified with a weapon or physically fit. *Id*. at 214-15.

In recommending dismissal, Manning addressed Mitchell's failing the final physical exam, as well as his concerns with her firearms competence. *Id*. at 216; Def. Ex. 7. He specifically noted her extensive remedial training with highlighted excerpts from firearms trainers Stover and Urbani, who had serious concerns about officer safety. *Id*. at 216; Def. Ex. 7 at 3, ¶¶ 7, 8. Even if Mitchell had passed the final physical fitness test, Manning believes he still would have recommended dismissal because he looks beyond the minimum standards to see how Mitchell reached them—including requiring five attempts to qualify at firearms, the multiple efforts at remedial training, including on the PRISM system, and ample opportunity to run and rehab from injury. Tr. Vol. I at 262-63. He looked at Mitchell's behavior within the Academy, in a strict environment, and considered how she would have been outside of that environment. *Id*. at 263. In the end, Manning believed that she would not make it through field training as a trooper. *Id*. at 267.

Manning made his recommendation for dismissal on January 3, 2008, based upon the ADO Report and the information from all of the instructors who submitted information that was summarized in the ADO Report. *Id*. at 243-44. Manning sent this recommendation up the chain of command to Colonel Miller, the head of the state police at the time. Miller knew that the discrimination investigation was not completed at this time. *Id*. at 245. Manning recommended that Mitchell not graduate based on the totality of what he was seeing. Manning did not agree with Mitchell's claim that she was not given time to exercise and build up her endurance. The reports he had reviewed showed otherwise. *Id*. at 237-38. Manning was

unaware of any discussion between Mitchell and Sgt. Andrews or between Andrews and Potter about Mitchell until trial. *Id*. at 239, 248, 260.

At the same time, however, Manning thought Mitchell had said enough in her December 21, 2007 letter to trigger an investigation which Manning started via Internal Affairs. Mitchell was held at the Academy while Internal Affairs investigated the complaints raised in her December 21, 2007 letter. *Id*. at 235-36, 246. Thus, despite Mitchell's having been recommended for dismissal, Colonel Miller decided to keep Mitchell on until the IAD investigation was completed. *Id*. at 244-46. She remained at the Hershey training center to continue training while also working in procurement and supplies. *Id*. at 113-14.

Sgt. Karas conducted the investigation. Karas interviewed everyone and Manning ultimately reviewed and adjudicated his report, which included looking at all of the interviews and documentation that Karas obtained. *Id*. at 208-10; Pl. Ex. 14. Karas's investigation found nothing to corroborate the allegations that Mitchell was being discriminated against or abused during training. Tr. Vol. I at 246; Pl. Ex. 14. Andrews testified that he had not been consulted by Manning about any gender discrimination issues even though Andrews' meeting with Mitchell was referenced in Mitchell's letter to Manning. Tr. Vol. I at 30.

Mitchell expected to graduate on December 21, 2007 and learned from Manning that she would not graduate one or two days before graduation. Tr. Vol. I at 98-99. Mitchell testified that she saw Potter at the graduation ceremony and that he said, "see, I told you" as he walked by. *Id*. at 99. In doing the physical fitness tests in 2008, Mitchell pulled her hamstring. Because of this injury in 2008, Mitchell signed another conditional resignation in March 2008. *Id*. at 114-15.

Mitchell called Manning in May of 2008 after not hearing from anyone since her departure in March 2008. *Id*. at 115-16. Mitchell testified that in June 2008 she received a letter dated May 18, 2008. Mitchell testified that this letter indicated that she had been terminated effective April 28, 2008. *Id*. at 115-16. Mitchell testified that had she not been terminated, she intended to work a full period of service of 25 years. *Id*. at 118. Mitchell testified that she suffered from depression and embarrassment and humiliation from being singled out and not allowed to graduate from the Academy. *Id*. at 118-21.

After Mitchell left the PSP Academy in March 2008, she had additional physical issues including a torn ACL. Tr. Vol. I at 124-25. As of trial, Mitchell had not worked since March 2008. Mitchell started looking for work when her workers' compensation ran out because she wanted to be cleared from her injuries to be employed. She applied for Social Security Disability benefits when she stopped receiving workers' compensation because she felt she was unable to work. As of trial, Mitchell testified that she had needed to see a psychologist to apply for Social Security Disability benefits but otherwise has not been seen by any psychiatrist or psychologist. *Id*. at 70, 125-26.

## VI.   Conclusions of Law

After Summary Judgment, two broad issues remain in this case: (1) whether Defendant Pennsylvania State Police is liable to the Plaintiff for discrimination and retaliation under Title VII; and (2) whether Defendant William Potter is liable to the Plaintiff under the PHRA.

Based on the above findings of fact, the Court draws the following conclusions of law with regard to the two issues that remain: (1) Defendant PSP is not liable to the Plaintiff for

discrimination or retaliation under Title VII; (2) Defendant William Potter is not liable to the Plaintiff under the PHRA.

## A. Discrimination and Retaliation under Title VII

At Summary Judgment, the Court noted that Congress validly abrogated the States' Eleventh Amendment immunity in actions brought under Title VII. ECF No. 48 at 33, 37 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447-457 (1976)). The Court thus has jurisdiction to entertain Mitchell's Title VII claims against the PSP.

Following the Court's Memorandum Opinion and Order on the Defendants' Motion for Summary Judgment (ECF No. 48), Mitchell makes two remaining allegations under Title VII. First, Mitchell alleges that Defendant PSP violated § 2000e-2(a) by disciplining and discharging her because of her sex. ECF No. 24 at ¶¶ 40, 43-44. Second, Mitchell alleges that Defendant PSP retaliated against her for engaging in statutorily-protected conduct in violation of 42 U.S.C. 2000e-3(a). *Id.*

For the reasons that follow, the Court concludes that Defendant PSP is not liable to Mitchell under Title VII because Mitchell failed to establish her claims for discrimination and retaliation by a preponderance of the evidence. The Court thus enters judgment in favor of Defendant PSP on both of these claims under Title VII.

### 1. Mitchell failed to prove gender-based discrimination under Title VII

For the reasons that follow, the Court concludes that Mitchell failed to establish a *prima facie* case of discrimination under Title VII, and that even if she had established such *prima facie* case for discrimination, she failed to prove that PSP's legitimate nondiscriminatory motives for

her termination were mere pretext. The Court thus holds that PSP is not liable to Mitchell for discrimination under Title VII.

Title VII's anti-discrimination provision, which is codified at 42 U.S.C. § 2000e-2(a), provides:

**§ 2000e-2.  Unlawful employment practices**

**(a) Employer practices**.  It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

This is an employment discrimination case in which no "direct evidence" of discrimination was presented. Thus, the Supreme Court's framework in *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), guides the Court's analysis for Mitchell's sex-based discipline and discharge claims. *See Fichter v. AMG Resources Corp.*, 528 Fed. Appx. 225, 227-28 (3d Cir. 2013) ("Where no direct evidence of discrimination exists, we apply the burden-shifting analysis set forth in *McDonnell Douglas Corp v. Green*). [2]

---

[2] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which "direct evidence" of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). The evidence Mitchell presented at trial does not constitute "direct evidence" of discrimination.

In an employment discrimination case of this kind, the plaintiff must first establish a *prima facie* case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 402. If a *prima facie* case of discrimination is established, the defendant must then articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id*. at 802-03. If the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reason given by the defendant for such treatment is merely pretext for unlawful employment discrimination. *Id*. at 804-05. Evidence suggesting that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff may use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. To establish a *prima facie* case of discrimination, the plaintiff must show that: (1) he or she is a member of a protected class; (2) he or she is qualified for the position; (3) he or she was either not hired or fired from that position; and (4) such not hiring or firing occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Id*. at 411. Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical

formula." *Cobetto v. Wyeth Pharmaceuticals*, 619 F.Supp.2d 142, 153, n.3 (W.D.Pa. 2007) (emphasis in original), citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). A *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant. *Furnco Construction Corp. v. Waters*, 348 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). This inference is based on an assumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors." *Id*.

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254-55. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id*.

If the defendant meets its burden of production, the dispositive factual issue is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56. To establish that the defendant is liable for illegal

employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be established upon a fact finder's mere disbelief of the defendant's proffered reasons for an adverse employment action, but rather upon the fact finder's affirmative belief of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original). Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's *prima facie* case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, "but may also be more certain, satisfying and

persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100, quoting *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Depending on the circumstances of the particular case, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.

To the extent that Mitchell bases her claims directly on the infractions charged to her, she can hold the PSP liable under Title VII by demonstrating that a similarly-situated male would not have been charged with infractions. *Burlington Industries, Inc. v. Ellreth*, 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining that "a tangible employment action taken by a supervisor becomes for Title VII purpose the act of the employer"). If Mitchell surmounts that hurdle, she can hold the PSP liable for the decision to terminate her employment by showing that her supervisors intended that the charged infractions would result in her discharge, and that the infractions proximately caused her discharge. *Staub v. Proctor Hostpial*, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011); *McKenna v. City of Philadelphia*, 649 F.3d 171, 177-79 (3d Cir. 2011).

The Court concludes that Mitchell failed to establish a *prima facie* case of discrimination.[3] After concluding its analysis of the *prima facie* discrimination issue, the Court will, nonetheless, conduct a full analysis on the merits under the *McDonnell Douglas-Burdine* burden-shifting framework described above.

---

[3] The Court denied the Defendants' motion for judgment under Rule 50 at trial and allowed Defendants to proceed with their presentation of the defense in this case. ECF No. 122 at 178. As the factfinder in this case, the Court found that a full review by the court and the presentation of the defense's case was in order. With the benefit of all parties' evidence now before it, the Court concludes that the Plaintiff failed to establish her *prima facie* case.

### a. Plaintiff's *prima facie* case of discrimination

As outlined above, to establish a *prima facie* case for discrimination, Mitchell had to establish at trial that: (1) she is a member of a protected class; (2) she was qualified to graduate from the PSP Academy; (3) she was terminated from that position; and (4) she was terminated under circumstances that give rise to an inference of unlawful discrimination. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999).

The Court concludes that Mitchell failed to establish a *prima facie* case of discrimination under Title VII. Specifically, Mitchell failed to establish elements two, that she was qualified to graduate from the PSP Academy, and four, that her termination occurred under circumstances that give rise to an inference of unlawful discrimination.

Prong one of the burden-shifting analysis is not in issue in this case. As a woman, Mitchell is a member of a protected class under TitleVII. *See* 42 U.S.C. § 2000e-2(a).

Moving to prong two of the *prima facie* case, the Court considers whether Mitchell produced evidence sufficient to establish that she was qualified to graduate from the PSP. The Court concludes that the evidence at trial established that Mitchell did not meet the minimum requirements for graduation from the Academy and that she was therefore not qualified to graduate with the 125th class.

The Academy sets out strict qualifications and performance standards that those who come into the Academy must meet. Tr. Vol. I at 182-83. These requirements are the same for both male and female cadets and include tests of physical fitness, firearms qualifications, uniforms, and driving. *Id*. at 186. These requirements were taken into account throughout training; cadets who failed a physical fitness test such as the sit-up requirement or the run time

two out of three times during the week were restricted to SWTC for the weekend. Tr. Vol. II at 18-19, 88, 188.

Manning, who was responsible for the ultimate graduation decision for Mitchell, stated that he decided to request an ADO inquiry on Mitchell after being made aware of her problems with physical fitness and firearms. Tr. Vol. I at 198-99. Manning stated that Mitchell's failure on the 300-meter run constituted automatic termination because it was a failure of the minimum standard for physical fitness required to graduate. *Id*. at 191.

The evidence at trial established that Mitchell was not qualified for the position of police officer because of her failure to meet the minimum standards for graduation in physical fitness. Mitchell failed all but two morning run times between approximately June 25, 2007 (the first morning run) and August 15, 2010 (when Mitchell suffered a toe injury). Tr. Vol. II at 38-43, 44; Def.Ex. 3. At trial, Mitchell testified that she knows she passed on one other occasion during this time frame because another instructor told her that she did, but that Potter came along and said she failed it. Tr. Vol. I at 150. The Court concludes that it does not need to resolve this factual dispute. The mere fact that during this time frame, there would have been approximately 30 morning runs, of which Mitchell passed the time on at most three supports the conclusion that Mitchell was not qualified to graduate from the Academy.

After Mitchell was declared medically cleared from her toe injury on September 10, 2007, Mitchell returned to running. She ran all morning runs over the next two weeks but never made the time. Tr. Vol. I at 129-30; Tr. Vol. II at 43-44; Def. Ex. 3. Mitchell suffered other injuries. These included a hip strain on September 28, 2007 and a neck and back strain on November 28, 2007. Tr. Vol. I at 129-30; Tr. Vol. II at 49-50. Mitchell and several other injured cadets were

given an extra week for physical rehab before they performed the final physical fitness test. These cadets, including Mitchell, took the test on December 18, 2007. Tr. Vol. I at 219-21, 233.

The doctor cleared Mitchell to take the final physical fitness test on December 18, 2007. *Id.* at 233. Mitchell failed to meet the minimum standards on the final 300-meter run test in Hershey by seven seconds. *Id.* at 100-01, 190-01; Def. Ex. 6 at Tab 31.

The Court notes that at trial, Mitchell testified that Potter precluded her from using the treadmill and from running in the evenings. She stated that Potter did not give her the opportunity to have remedial physical training to increase her stamina. Tr. Vol. I at 82-84. The Court finds, however, that these assertions are not supported by facts in the record and are renbutted by the credible testimony of Potter, who stated that he never told Mitchell that she could not work out in the gym or run on her own after hours or on weekends. Tr. Vol. II at 32-33, 78-80. Potter's testimony on this point is supported by evidence presented at trial that established that Mitchell did in fact use the gym in November. *Id.* at 34-36; Def. Ex. 14. Potter also explained that the only reason Mitchell would have been restricted from using the treadmills would have been during the morning runs, because Andrews had issued an order requiring injured cadets to do the medicine ball routine. Tr. Vol. II at 44-45. Because the Court finds that the record supports Potter's testimony on these points, the Court affords no weight to Mitchell's testimony that Potter prevented her from opportunities for remedial physical training. This testimony thus does not change the Court's conclusion that Mitchell failed to establish her *prima facie* case of discrimination.

The evidence described above does not establish that Mitchell was qualified to graduate from the Academy or to become a state trooper. Rather, it establishes that Mitchell failed to

meet the minimum requirements for graduation in physical fitness. These minimum requirements for graduation were imposed on all cadets at the Academy, and other cadets (male or female) who failed to meet these criteria also were not permitted to graduate. The Court takes into account Mitchell's testimony that she passed three, not two, of the morning runs, and her testimony that Potter precluded her from remedial training in physical fitness and firearms. As discussed above, these assertions are either directly contradicted by Mitchell's own testimony or by other credible evidence and testimony presented at trial. The Court thus affords this testimony no evidentiary value and finds that Mitchell was not qualified to graduate from the PSP Academy under prong two of Mitchell's *prima facie* case for discrimination.

The third prong of the *prima facie* case is not in issue. It is undisputed that Mitchell was terminated from the PSP Academy. The Court concludes that this termination satisfies prong three of Mitchell's *prima facie* case.

Moving on to the fourth and final prong of Mitchell's *prima facie* case, the Court finds that Mitchell failed to establish that she was terminated and not permitted to graduate under circumstances supporting an inference of unlawful discrimination.

Mitchell testified that she "felt [Potter] was singling her out as a female." Tr. Vol. I at 77. When asked why she thought he was singling her out, Mitchell stated that she "thought it was because [she] wasn't a fast runner." *Id.* at 77. She also testified that Potter told her he would break her down emotionally and physically and that he would make sure that she did not graduate. *Id.* at 80. Mitchell testified that she "felt" that Potter said these things because of her gender. *Id.* She also testified that she was not given the same opportunities to have remediation firearms and physical fitness training because she "didn't play the flirting game." *Id.* Mitchell

stated that she had observed another female cadet who graduated with the 125th class, Brianne Glad (maiden name Yachera) having candlelight dinners with Potter and offering to bring him food and show him classic cars. Mitchell stated that he treated these females who "played the flirting game" differently. *Id*. at 80-81.

The Court finds that Mitchell's testimony is not credible and is rebutted by Potter's testimony and the testimony of other cadets at the Academy. The Court thus affords Mitchell's testimony on these points no evidentiary value. Potter denied that any candlelight dinner ever took place. Tr. Vol. II at 71. In addition, Brianne Glad testified that she never had a candlelight dinner with Potter or heard of or saw anyone else having such a dinner with Potter. *Id*. at 189-90. Wroble testified on cross examination that she never heard about Glad ever having had a candlelight dinner with Potter. *Id*. at 206. Glad testified that she is of Polish ancestry and at some point brought perogies in for all of the instructors. *Id*. at 190. Because the Court finds the testimony of Potter, Glad, and Wroble to be credible and to rebut Mitchell's testimony, the Court concludes that these allegations do not raise an inference of discrimination in support of Mitchell's *prima facie* case.

Mitchell also testified that Potter singled her out and called her "muffin," and that when she told him that she did not appreciate this name, he told her to "suck it up." Tr. Vol. I at 88. The Court finds, however, that this testimony is rebutted by the credible testimony of other witnesses at trial and by other evidence offered by Mitchell, and thus affords Mitchell's testimony on this point no weight. The Synopsis of the PSP investigation prompted by Mitchell's complaint includes an analysis of interviews with every member of the 125th cadet class of which Mitchell was a part. Pl. Ex. 14 at 11. This synopsis indicates that no trooper

observed any unwarranted prejudice against Mitchell. No trooper indicated that Mitchell had been treated unfairly. *Id*. at 12. Brianne Glad, a female who graduated with the 125th class, testified in court that she never heard Potter use the term "muffin." Tr. Vol. II at 190. Tonya Wroble, another female cadet who graduated with the 125th class, also testified that she never heard this term used. *Id*. at 203. Both female cadets testified that Potter used the word "pathetic" frequently, but that he used this word toward all cadets, not just females or just toward Mitchell. *Id*. at 190-91, 203. Wroble also testified that Potter spoke to them about being females, but stated that Potter had instructed them that people on the street would not take their gender into account so they needed to learn to be tough and look out for each other and stay physically fit so that they could handle themselves outside of the Academy. *Id*. at 204. Wroble also testified that although Potter yelled at Mitchell more than other cadets, he generally did this with cadets that were falling behind and that it was likely to try to get Mitchell to push herself to do more or try harder. *Id*. at 204.

More specifically, Glad testified that she never heard Potter express any kind of hostility toward female troopers or suggest that Mitchell or anyone else couldn't do the job because she was a female. *Id*. at 191.Glad also testified that another female cadet had to leave because of a medical condition and that when they went to say goodbye to her, Potter stated that he hoped she came back with a later class to become a trooper. Glad testified that this female cadet is now a trooper. *Id*.at 192.

In addition, Wroble testified that she was injured at some points during the class totaling approximately nine or ten weeks. *Id*.at 198, 200. As a result of these injuries, Wroble missed some of the morning runs and was required to do the medicine ball activity. *Id*.at 198-

99. Despite these injuries, Wroble kept up with whatever physical training she could without further aggravating her injury. *Id*.at 202. She testified that going out on runs informally at night or on weekends was permitted. *Id*.at 202.

Indeed, the evidence at trial established that several other cadets, including both male and female, had missed morning runs because of injuries like Mitchell did but were still able to pass the final physical test and thus able to graduate. *Id*.at 69-70. Another cadet (male) also failed the final physical fitness test; he also did not graduate. Tr. Vol. I at 100-01. This evidence supports the Court's conclusion that Mitchell has not raised an inference of discrimination on the basis of her gender. The Court recognizes that merely failing another student who is a male does not absolve the PSP of any potential liability for gender discrimination claims. This fact is probative, however, when considered in context. That the only other student who did not graduate because of failure on the physical fitness assessment was a male supports this Court's conclusion that Mitchell was not singled out on the basis of her gender. This conclusion is further supported by Potter's testimony, the PSP Report Summary, and the testimony of two other female cadets who did graduate with the 125th class.

The evidence described above rebuts Mitchell's testimony. The Court concludes that Mitchell's testimony regarding adverse treatment by Potter does not raise an inference that she was terminated from the Academy on the basis of unlawful gender discrimination.

The Court concludes based on the evidence as presented at trial that Mitchell failed to establish elements two and four of her *prima facie* case. Thus, Mitchell's claim for discrimination under Title VII must fail. The Court will, nonetheless, conduct the full analysis under the *McDonnell Douglas-Burdine* burden-shifting framework.

### b. Defendants' legitimate nondiscriminatory motive for termination

The second step of the burden-shifting analysis requires PSP to offer a legitimate nondiscriminatory motive for preventing Mitchell from graduating. PSP offered several such motives. Specifically, the defendants offered evidence to support that Mitchell was prevented from graduating based on (1) her failure to meet minimum standards for physical fitness, (2) her struggles and safety issues in firearms training, and (3) her infractions when considered in the totality of the circumstances surrounding her dismissal.

As discussed above, the evidence presented at trial establishes that Mitchell was prevented from graduating because she failed to meet the minimum standards required to graduate. Specifically, the evidence showed that Mitchell did not graduate because she did not pass the final physical fitness test. Tr. Vol. I at 213. A male cadet who failed the final physical fitness exam also did not graduate. *Id*.at 100-01. The Court concludes that this failure to meet minimum fitness requirements constitutes a legitimate nondiscriminatory motive for Mitchell's termination.

In addition, the evidence at trial showed that Manning considered Mitchell's four failures to qualify on the firearms range in his decision to recommend Mitchell's termination. *Id*.at 212. Manning addressed Mitchell's extensive remedial training, including on the PRISM system, in making his determination. *Id*.at 216; Dev. Ex. 7 at 3, ¶¶ 7, 8. Mitchell failed her first four qualifying attempts on the firearms range. Tr. Vol. II at 132-34, 137; Def. Ex. 2. Only two troopers took more than one attempt to qualify and these two troopers qualified on the second attempt. Pl. Ex. 14, at 11. Although Mitchell did ultimately pass on the fifth attempt at firearms qualification, Manning looked at all of the hours that went into the fifth attempt to qualify as

well as the practice and ammunition, and the fact that even with all of these resources, Mitchell still passed with only the minimum score needed to qualify. Tr. Vol. I at 212. After Mitchell's first three failures on the qualifying course, Urbani and Copechal took Mitchell to the live range to practice on October 10 and 11, 2007. Tr. Vol. II at 135-36; Def. Ex. 6 at Tab 23, ¶ 3. Potter and Urbani also set up the qualification course in the PRISM system for Mitchell and allowed her to use this system five or six times prior to her fourth failed attempt at the qualifying range. Tr. Vol. II at 27-28, 136; Def. Ex. 6 at Tab 23, ¶ 3.

Mitchell also performed poorly on the stress course range for firearms training. She had trouble with engaging threats, accuracy, transitioning, and tactical reloads from cover. Tr. Vol. II at 141; Def. Ex. 6 at Tab 23, ¶¶ 4-6. One time while on the stress course, Mitchell ran out of ammunition. When asked by Copechal, "what now," Mitchell responded, "I'm dead." Tr. Vol. II at 141-42; Def. Ex. 6 at Tab 23, ¶ 6. Mitchell had to write more than 60 letters concerning firearms issues to Copechal and Urbani. Tr. Vol. I at 150-51; Def. Ex. 6 at Tab 26.

Mitchell's problems with safety on the live fire range also weighed heavily in Manning's determination. Tr. Vol. I at 212. On this range, Mitchell failed to follow instructions that had been given in the classroom and continually erred when operating the charging handle. Tr. Vol. II at 167. Stover corrected Mitchell 11 times on October 20, 2007, many times for the same mistakes. *Id*. at 168; Def. Ex. 6 at Tab 22, ¶ 3. Mitchell was also ordered off of the range on October 21, 2007, when she was unable to clear her pistol and pointed a weapon directly at the head of the cadet next to her. Tr. Vol. II at 173; Def. Ex. 6 at Tab 2, ¶ 5.

Mitchell testified that Potter prevented her from using the range to practice additional firearms training on the weekends. Tr. Vol. I at 93. This assertion, however, is not supported by

facts in the record and is contradicted by Mitchell's own testimony and by other evidence. Mitchell presented evidence that shows that she was given additional firearms training that was not offered to all cadets. This included firearms training on the PRISM system with Andrews between her third and fourth attempts at the qualifying range, both of which Mitchell failed. No other cadet was offered supplemental training on the PRISM system. *Id*. at 169; Pl. Ex. 14 at 11. Mitchell also testified that Potter and Urbani took over from Andrews and worked with Mitchell on the PRISM system. Tr. Vol. I at 169.

The Court concludes that Mitchell's documented struggles in firearms qualification and safety constitute a second legitimate nondiscriminatory motive for Mitchell's termination.

Manning also testified that Mitchell's infractions, which revealed a tendency to blame others rather than accept responsibility, weighed in his determination to prevent Mitchell from graduating. *Id*.at 213. These infractions concerned Manning because troopers have to react and act during stressful times. Manning needs to see that an individual is accountable and responsible, but Manning did not see these things in Mitchell's case. *Id*.at 213. Manning considered Mitchell's behavior within the Academy, which is a strict environment, and considered how she would be outside of that environment. *Id*.at 263. Manning believed she would not make it through field training as a trooper. *Id*.at 267. Manning ultimately made his recommendation for dismissal based on the ADO Report and the information from all instructors who submitted information summarized in that report. *Id*.at 243-44. Based on the totality of what Manning was seeing, he recommended that Mitchell should not graduate. *Id*.at 237-38.

The Court notes that Mitchell testified at trial that her failure to meet minimum standards in physical fitness and her struggles in firearms should be attributed to being prevented from remedial training by defendant Potter. However, as already discussed, the Court does not find this testimony to be credible. In addition to the rebutting evidence discussed above, Manning testified that he did not agree with Mitchell's claim that she was not given time to exercise and build up her endurance or that she was not trained. He testified that the reports he had seen showed otherwise. *Id.* at 237-38. The Court finds that Mitchell's infractions considered in the totality of the circumstances surrounding her dismissal constitute a third legitimate nondiscriminatory motive for Mitchell's termination.

The Court thus concludes that even if Mitchell had established her *prima facie* case, the Defendant met its burden of producing a legitimate nondiscriminatory motive for Mitchell's termination. Specifically, the Court concludes that the Defendant established that it had legitimate reasons to terminate Mitchell grounded in her failure to meet the minimum requirements for physical fitness, her struggles and safety issues on the firearms range, and her various infractions when considered within the totality of the circumstances surrounding her termination.

c.      **Whether Defendant's proffered motive was mere pretext**

At the third step of the burden-shifting framework, Mitchell must convince the trier of fact, the Court in this case, that discriminatory animus was the real reason that she did not graduate with the 125th class. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). This step requires Mitchell to point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in PSP's proffered legitimate motives to render these motives unworthy of

credence. *Carroll v. Acme Truck Line Inc.*, 992 F.Supp.2d 512, 531 (W.D.Pa. 2014), *citing Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal quotations omitted). Mitchell failed to convince the Court that the Defendant's proffered motives were mere pretext and that gender-based discrimination was the real reason that she did not graduate from the Academy. The Court thus concludes that even if Mitchell had established her *prima facie* case for discrimination, her claim for liability against PSP for unlawful discrimination under Title VII would fail at this third step.

Mitchell urges the Court to conclude that Manning's stated reasons for terminating Mitchell were contradictory. Mitchell argues that Manning stated during his testimony that the test for graduation was an objective one, but then later in his testimony stated that the test was subjective and based on the totality of the circumstances. ECF No. 120 at 56. The Court notes that Manning indicated that there are certain failures that constitute automatic termination including failure on physical fitness or firearms testing. Tr. Vol. I at 188. The Court also notes that Manning stated that even if Mitchell had met the minimum standards for physical fitness, he still would have recommended her termination because Manning looked at the "totality of the circumstances around her getting those standards." *Id*. at 262.

The Court does not agree with Plaintiff that this testimony is contradictory. Rather, the Court concludes that Mitchell's failure to meet the minimum standards on the physical fitness test was a sufficient objective reason for her termination, but in this case, it was not the only reason for her termination, because Manning found several other factors in the ADO report that supported her termination. Mitchell's struggles in many areas including firearms, physical fitness, and infractions throughout training went into his ultimate decision to recommend Mitchell's termination. The Court does not find that Manning fluctuated between imposing an

objective standard and a subjective one or that his testimony was contradictory in this regard. The Court thus concludes that Manning's testimony on the standards he used in making his decision do not indicate that PSP's proffered motives for Mitchell's termination were mere pretext.

Mitchell testified that Potter "singled her out" in certain ways, but the instances about which she testified do not support the argument that gender discrimination was the real reason for her termination. For example, Mitchell testified that she thought Potter singled her out because she "wasn't a fast runner." Tr. Vol. I at 77. This testimony does not indicate that Mitchell's failure to graduate from the Academy was based on gender. Rather, it lends credence to PSP's proffered legitimate reason for her termination, because it indicates that Mitchell was not physically at the level that was expected of cadets.

In addition, when asked by counsel why Mitchell believed Potter targeted her because of her gender, Mitchell stated that she "felt it was because" of her gender. Tr. Vol. I at 80. She based this belief on the fact that she was not "given the same opportunities to have remediation firearms [and] … [p]hysical training." Tr. Vol. I at 80. As discussed above, these assertions are not supported by evidence in the record. Further, even if these allegations were true, there is no evidence in the record to suggest that such actions were based on Mitchell's gender, especially because the Court heard testimony from two other female cadets who were not prevented from remediation or physical training during their training with the 125th class. Several other cadets, male and female, were also injured during a significant portion of the class and were still able to train independently to maintain the physical condition required to pass the final physical fitness test.

Mitchell presented no other evidence to convince the Court that discriminatory animus was the real reason that she did not graduate and that the PSP's proffered motives were mere pretext. At this step, Mitchell must demonstrate that PSP's reasons for dismissal were pretext for discrimination, not pretext for something else. *Carroll v. Acme Truck Line, Inc.*, 992 F.Supp.2d 512, 531. Mitchell has failed to make this showing. The Court thus concludes that, even if Mitchell had established a *prima facie* case of discrimination, she failed to establish that PSP's proffered legitimate nondiscriminatory motives for her termination were mere pretext. The Court thus enters judgment in favor of PSP on Mitchell's claim for discrimination under Title VII.

**2.      Mitchell failed to prove retaliation under Title VII**

For the reasons that follow, the Court concludes that Mitchell failed to establish a *prima facie* case of retaliation under Title VII. Moreover, as the Court noted above, even if Mitchell had established such *prima facie* case for retaliation, she failed to prove that PSP's legitimate nondiscriminatory motives for her termination were mere pretext. The Court thus holds that PSP is not liable to Mitchell for retaliation under Title VII and enters judgment on this claim in favor of PSP.

Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for an employer "to discriminate against" an employee (1) "because he [or she] has opposed any practice made an unlawful employment practice by Title VII, or (2) "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder. 42 U.S.C.  2000e-3(a).

For the "participation clause" to come into play, a charge of discrimination must be filed with the EEOC. *Hubell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 440 (W.D.Pa. 2010). Since Mitchell's charge of discrimination was not filed until after her dismissal, her retaliation claims must be premised on Title VII's "opposition clause." *See id*. at 440-41.

Like discrimination claims under Title VII, retaliation claims are governed by the *McDonnell Douglas-Burdine* burden-shifting framework, which requires the plaintiff to first establish a *prima facie* case of retaliation. *See id*. at 436. To establish a *prima facie* violation of Title VII's anti-retaliation provision, Mitchell must show that: (1) she engaged in conduct entitled to statutory protection; (2) PSP responded by taking a "materially adverse" action (or a series of "materially adverse" actions); and (3) there was a causal connection between Mitchell's statutorily-protected conduct and the PSP's "materially adverse" action (or series of "materially adverse" actions). *Estate of Oliva v. Dept. of Law & Public Safety*, 604 F.3d 788, 798 (3d Cir. 2010). For an employee's "opposition" to unlawful discrimination to be statutorily-protected, the employee must act on the basis of an objectively reasonable belief that the "opposed" conduct actually violates Title VII. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). A retaliatory action is considered to be "materially adverse" to an employee if it might have dissuaded an objectively reasonable employee from engaging in statutorily-protected conduct. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The Supreme Court has explained that an individual may "oppose" unlawful discrimination simply by refusing to assent to it. *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009).

Mitchell met with Sgt. Andrews on December 3, 2007. Mitchell testified that she raised issues related to firearms training and whether she would be able to participate in a class instruction later that week. Tr. Vol. I at 92, 95. Mitchell testified that she also raised concerns that she was being targeted by Potter because of her gender at this meeting. *Id*. at 91, 93. After this December 3, 2007 meeting, Potter approached Mitchell during her lunch break and ordered Mitchell to write an infraction letter stating that Mitchell had gone out of the chain of command when she spoke to Andrews. *Id*.at 94; Pl. Ex. 12. Mitchell testified that Andrews later told Mitchell that he had spoken to Potter and that "the issue was addressed" with him. Tr. Vol. I at 96.

Potter testified that he had Mitchell write the chain of command letter on December 5, 2007 because when Mitchell went to Andrews about attending class, this violated the chain of command. Tr. Vol. II at 59-63, 96-98; Def. Ex. 6 at Tab 18. Potter had previously explained to Mitchell that she could not attend a building search exercise because she had missed the previous classroom instruction due to a doctor's appointment. Tr. Vol. II at 59-63, 96-98. Potter did not tell Mitchell that she could not talk to the ADO or complain about gender discrimination; it would not be a chain of command violation if a cadet bypassed Potter to make such a complaint. Tr. Vol. II at 64.

To establish a *prima facie* case of retaliation under Title VII, Mitchell must first establish that she engaged in statutorily-protected conduct. The Court concludes that this first element is established. Mitchell engaged in statutorily-protected conduct when she complained to Andrews about Potter singling her out on the basis of her gender. *See* 42 U.S.C. 2000e-3(a).

The second element Mitchell must prove to establish a *prima facie* case of retaliation is that PSP took a materially adverse action against her. The Court concludes that Mitchell has also established this element because the evidence at trial showed that Mitchell was terminated from the Academy and was not allowed to graduate. Being terminated and not being allowed to graduate from the Academy would dissuade an objectively reasonable cadet from engaging in the statutorily-protected conduct of complaining to a supervisor about gender discrimination. Thus, Mitchell's termination constitutes a materially adverse action against Mitchell and satisfies element two of Mitchell's *prima facie* case for retaliation under Title VII.

The third and final element that Mitchell must prove to establish a *prima facie* case of retaliation under Title VII is causation. To show causation, Mitchell needed to establish at trial that the statutorily-protected conduct of complaining about gender discrimination to Andrews was a but-for cause of her termination. *See Costa v. Pennsylvania Dep't of Revenue*, 2014 WL 1235879, at *12 (W.D.Pa. March 25, 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013)). The law requires Mitchell to prove that the causal link between her injury (being terminated and prevented from graduating) and the wrong (the retaliatory conduct) is so close that the injury would not have occurred but for the retaliatory act. *See Costa*, 2014 WL 1235879, at *12. The Court concludes that Mitchell failed to establish causation. Thus, Mitchell failed to establish a *prima facie* case of retaliation under Title VII.

Mitchell urges the Court to conclude that Potter ordered her to write unwarranted infraction letters with discriminatory intent with the specific goal of preventing her from graduating and that these letters, in turn, weighed in Manning's decision to terminate Mitchell.

*See* Tr. Vol. I at 80, 96-97. The Court concludes that the evidence presented at trial does not support this theory of causation for several reasons.

First, the evidence set forth above for Mitchell's discrimination claim establish that PSP had legitimate nonretaliatory reasons to terminate Mitchell and to prevent her from graduating from the Academy. These included her failure to meet minimum standards on the physical fitness test, her struggles and safety issues during firearms training, and her numerous infractions when considered in the totality of the evidence that Manning reviewed when making his termination decision.

Second, Mitchell spent the last two weeks of training not at SWTC under Potter's supervision, but rather at the Hershey Academy. The evidence presented at trial established that the class left a few days after the December 5, 2007 chain of command letter was written to go to Hershey for the last two weeks of training. Tr. Vol. II at 65-66; Def. Ex. 1. Potter did not go with the class to Hershey. Tr. Vol. II at 66-67; Def. Ex. 1. Mitchell testified that the intimidation and harassment from Potter got worse after her meeting with Andrews. Tr. Vol. I at 98. The Court concludes that this testimony is contradicted by the evidence presented at trial that indicates that shortly after Mitchell's meeting with Andrews, Mitchell was no longer in Potter's presence. The Court does not find Mitchell's testimony that Potter's conduct worsened after this meeting with Andrews to be credible. The Court thus concludes that Mitchell's testimony on this point does not support a finding of causation between her statutorily-protected conduct and her termination from the Academy.

Third, Potter's credible testimony also establishes that Mitchell's complaint to Andrews was not a but-for cause of her termination. The evidence at trial did not establish that the

December 5, 2007 letter was ordered in retaliation for her complaining to Andrews about gender discrimination. Rather, the evidence at trial established that when Potter ordered Mitchell to write the December 5, 2007 letter, Potter believed that Mitchell had gone to Andrews to ask about attending a class. Tr. Vol. II at 59-63, 96-98. There was no evidence presented at trial from which the Court concludes that Potter required Mitchell to write this letter in retaliation for Mitchell having complained to Andrew about gender discrimination.

Moreover, even if the Court were to assume that Potter did order Mitchell to write letters in retaliation for her gender discrimination complaint to Andrews, the Court would still conclude that this retaliation was not a but-for cause of Mitchell's termination for two related reasons: (1)Mitchell's letters to Potter constituted only a small percentage of the letters in the ADO report; and (2) Manning considered the letters in the context of the larger picture of Mitchell's tenure at the Academy, which included her failure to pass the final physical fitness test and her safety issues and struggles on firearms training.

Potter ordered Mitchell to write very few letters when viewed in the context of the total number of letters in the ADO report. Of the infraction letters in the ADO Report on which Manning based his termination decision, Potter only required Mitchell to write four total letters—one for lying about the number of pushups she had done, two for uniform and inspection violations, and the December 5, 2007 letter for going outside of the chain of command which was discussed above. Tr. Vol. II at 53-63; Def. Ex. 6 at Tabs 11, 16-18. Mitchell wrote more than 60 letters to Copechal and Urbani concerning firearms issues. Tr. Vol. I at 150-51; Def. Ex. 6 at Tab 26. Mitchell also wrote dozens of letters to instructors, including Bernard and Urbani, for missing morning runs or for not making the times. Tr. Vol. I at 149. That

Potter's letters comprised only a small percentage of the letters considered in support of Mitchell's termination indicates that Potter's letters were not a but-for cause of her termination. The Court concludes that even without Potter's four letters, Manning would have recommended Mitchell's termination from the Academy.

Further, Mitchell's infraction letters in from all instructors constituted only a small part of Manning's ultimate decision to recommend Mitchell's dismissal. Mitchell correctly points out that Manning considered the infraction letters as part of his termination decision. Manning stated that these letters, however, did not constitute a major factor in his decision to recommend Mitchell's dismissal. *Id*.at 214. Further, Manning testified that he did not consider the four letters that Potter ordered Mitchell to write in the ADO report to be serious violations. *Id*.at 217-19. Manning testified that his decision to recommend Mitchell's dismissal would have remained the same if these four letters had not been included in the ADO report. *Id*.at 219. The Court finds Manning's testimony on these points to be credible and supported by the record. The Court thus concludes that the infraction letters, even if ordered in retaliation for Mitchell's complaint of gender discrimination, were not a but-for cause of Mitchell's termination, as she would have been dismissed even if Potter had not ordered her to write these letters.

### B. PHRA

At Summary Judgment, the Court concluded that Mitchell's PHRA claims against the PSP were barred by the Eleventh Amendment. ECF No. 48 at 57. The Court determined, however, that a genuine issue of material fact existed as to whether Potter charged Mitchell with infractions for discriminatory or retaliatory reasons. The Court now concludes that the evidence presented at trial failed to prove Mitchell's PHRA claim against Potter by a

preponderance of the evidence. The Court thus enters judgment in favor of Potter on Mitchell's

PHRA claim against him.

The provisions of the PHRA defining the term "unlawful discriminatory practice" are

codified at 43 PA. STAT. § 955. The statutory provisions relevant to this case provide:

> **§ 955. Unlawful discriminatory practices**
> It shall be an unlawful discriminatory practice, unless based on a bona fide occupational qualification …, or except where based on applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required
> \*\*\*
> (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding, or hearing under this act.
> (e) For any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice

43 PA. STAT. § 955(a), (d)-(e).

The statute thus provides, in relevant part, that it is an "unlawful discriminatory

practice" for any *person* or *employee* "to attempt, directly or indirectly, to commit any act

declared by [the PHRA] to be an unlawful discriminatory practice." 43 PA. STAT. § 955(e). Under

this provision of the PHRA, supervisory employees may be held liable on the theory that supervisors may share the discriminatory purpose and intent of the employer that is required for aiding and abetting liability. *Holocheck v. Luzerne County Head Start, Inc.*, 385 F.Supp.2d 491, 498 (M.D.Pa. 2005). Mitchell can thus hold Potter, a supervisory employee of PSP, liable for his own discriminatory conduct if his actions in relation to her were taken for discriminatory or retaliatory reasons. To succeed on this point, Mitchell must convince the Court, the trier of fact in this case, that Potter acted with a "discriminatory purpose and intent." *Id*. at 497.

As trier of fact in this case, the Court concludes that the evidence at trial does not establish by a preponderance of the evidence that Potter acted with the requisite discriminatory purpose and intent for aiding and abetting liability to attach under the PHRA. *See Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011); *McKenna v. City of Philadelphia*, 649 F.3d 171, 177-179 (3d Cir. 2011).

As described at length above, Mitchell failed to prove that Potter engaged in unlawful discriminatory or retaliatory conduct against her. Moreover, the Court concluded that Mitchell failed to prove that any action on Potter's part was the cause of her termination. The Court therefore concludes that Mitchell failed to prove her PHRA claim for aiding and abetting liability against Potter and finds in favor of Potter on this claim.

## VII.    Conclusion

For the reasons stated above, Plaintiff's request for relief on all claims is denied.  The Court will enter judgment in favor of Defendants William Potter and the Pennsylvania State Police.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE M. MITCHELL, | ) | |
| | ) | **CIVIL ACTION NO. 3:10-129** |
| Plaintiff, | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| v. | ) | |
| | ) | |
| **WILLIAM POTTER and THE** | ) | |
| **PENNSYLVANIA STATE POLICE,** | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

AND NOW, this **29th** day of September, 2015, the Court having conducted a bench

trial on the issues of Plaintiff Danielle Mitchell's claims of alleged discrimination and retaliation

while Plaintiff trained as a cadet at the Pennsylvania State Police Academy, and upon

consideration of the parties' proposed findings of fact and conclusions of law (ECF Nos. 120 and

121), and other relevant filings on the record before the Court, and for the reasons set forth in

the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Plaintiff's claims for

relief are **DENIED. JUDGMENT** is entered in favor of Defendants and against Plaintiff on all

claims.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE